McALLISTER, Respondent, *v.* McDONALD et al., Appellants.

(No. 2,747.)

(Submitted January 19, 1910. Decided January 29, 1910.)

[106 Pac. 882.]

*Novation—What Constitutes — Evidence—Insufficiency—Appeal —Record—New Trial—Notice of Intention—Waiver.*

Appeal—Record—New Trial—Notice of Intention—Waiver.
1. Where the record on appeal disclosed that "the motion for new trial was duly presented to the court upon the said notice" of intention; that the respondent accepted service of the proposed statement of the case for use on appeal, without objection; that the statement was settled and signed by the trial judge as correct, and where the brief of respondent did not refer to the failure of appellant to serve his notice of intention to move for a new trial, and such objection was not raised until after oral argument on appeal

on the merits—*held*, that if the notice was not properly served, such omission was waived in the court below.

Novation—What Constitutes.

2.   To constitute a novation by the substitution of a new debtor in place of the original one, there must be a mutual agreement to that effect between the parties.   The assent to, and acceptance of, the terms of novation may be implied from the facts and circumstances attending the transaction and the conduct of the parties thereafter,. and in determining whether a novation took place, the intent, on the part of the creditor, to release the original debtor from his obligation, is of vital importance.

Same—Evidence—Insufficiency.

3.   Evidence examined and *held* insufficient to show a contract by novation.

Appeal—Insufficiency of Evidence—New Trial—When Granted.

4.   While the supreme court will not reverse a judgment on the ground of insufficiency of the evidence when it tends to sustain the judgment, it will grant a new trial where the only testimony which tended in the slightest degree to sustain the contention of the successful party was an isolated statement of one witness, brought out on cross-examination, and where the verdict was at variance with the great weight of the evidence and against all reasonable inferences or probabilities of the case.

*Appeal from District Court, Silver Bow County; John B. McClernan, Judge.*

ACTION by W. E. McAllister against Alexander McDonald and William Pelette, copartners as McDonald & Pelette.   Plaintiff had judgment, from which and an order denying a new trial defendants appeal.   Reversed.

*Messrs. Kirk, Bourquin & Kirk* filed a brief in behalf of Appellants.   Oral argument by *Mr. William R. Kirk.*

To support the cause of action alleged, the proof must be: (1) That Durand owed plaintiff; (2) that defendants promised to pay Durand's debt to plaintiff in consideration that plaintiff would release Durand and cancel the debt as to him; and (3) that plaintiff did release Durand and cancel the debt as to him.   And this proof must show that all parties so understood and agreed.   (29 Cyc. 1131, 1136; *Carpy* v. *Dowdell,.* 131 Cal. 495, 63 Pac. 779; *Maxwell* v. *Dell,* 11 Colo. 415, 18 Pac. 562; *Hanson* v. *Nelson,* 82 Minn. 220, 84 N. W. 742.) Novation is never presumed, and must be clearly proved by express agreement or acts clearly showing an intent to work a novation.   (29 Cyc. 1139; *J. Q. Case Co.* v. *Olson,* 10 N. D. 170;.

86 N. W. 718.)   The novation must be carried out.   If the original debtor be not released, the substitute's promise is without consideration and *nudum pactum.*   The discharge of the original debtor must appear from acts and not in a mere assertion thereof contradicted by conduct.   (*Johnson* v. *Rumsey,* 28 Minn. 531, 11 N. W. 69.)   In this case, there is no evidence of either the second or third of the elements above set out and necessary to constitute the contract of novation sued on.

One rule upon which defendants rely in this case is that where the verdict is supported by only isolated statements of a witness, which are in conflict with his other statements and other evidence, the appellate court will   grant a new trial. (*Lemans* v. *Wiley,* 92 Ind. 436; *Wunderlich* v. *Palatine etc. Ins. Co.,* 104 Wis. 382, 80 N. W. 469.)   Positive statements overborne by other evidence will not sustain a verdict clearly wrong, and a denial of a new trial will be reversed.   (*Jackson* v. *McNatt,* 4 Neb. (Unof.) 55, 93 N. W. 427.)   A party's positive testimony contradicted by his letter will not sustain a verdict. (*Boyd* v. *Colt,* 20 How. Pr. 384.)   Appellate courts will set verdict aside where manifestly against the weight of evidence. (*Kelly* v. *Kuntz,* 125 Ill. App. 487; *Dawdy* v. *Baker,* 123 Ill. App. 72.)   Where a party makes admissions, while testifying, that are clearly inconsistent with his version of the case, the verdict should have been set aside.   (*Preston* v. *Otey,* 88 Va. 491, 14 S. E. 68; *Jones* v. *Farmer,* 84 Ga. 296, 10 S. E. 626.)   Another rule is that where it appears the jury were moved by some equitable influence instead of by the evidence weighed by rules of law, the verdict will be set aside.   (*Furber* v. *Folger,* 97 Me. 585, 55 Atl. 514.)

In behalf of Respondent, there was a brief by *Mr. James T. Fitzgerald* and *Mr. B. S. Thresher,* and oral argument by both.

We contend that in addition to the direct and positive testimony, there is ample evidence to justify the verdict of the jury upon the grounds of an implied contract of novation, or at least an implied release of Durand by the plaintiff.   In the case of

*Illinois Ins. Co.* v. *Benner,* 78 Kan. 511, 97 Pac. 439, the supreme court of Kansas, in considering the question now under consideration, used this language: "The assent of the parties that the new obligation shall be accepted in discharge of the old one is an essential element, but the substitution may be accomplished by either an express or implied agreement." (*Harris* v. *Lindsay,* 4 Wash. C. C. 271, Fed. Cas. No. 6,124; *Warren* v. *Batchelder,* 15 N. H. 129; *Seaman* v. *Whitney,* 24 Wend. (N. Y.) 260, 35 Am. Dec. 618; *Whitney* v. *American Ins. Co.,* 127 Cal. 464, 59 Pac. 897; 21 Am. & Eng. Ency. of Law, 669.) "Express or implied assent might be given as in the case of ordinary contracts, and whether they assented or intended a novation is a question of fact for the jury and may be determined upon inferential as well as direct evidence." (*Walker* v. *Wood,* 170 Ill. 463, 48 N. E. 919; *Robbins et al.* v. *Robinson et al.,*176 Pa. 341, 35 Atl. 337; *Mulgrew* v. *Cocharen,* 96 Mich. 422, 56 N. W. 70; *Sinclair* v. *Richardson,* 12 Vt. 33; *Lynch et al.* v. *Austin,* 51 Wis. 287, 8 N. W. 129; 21 Am. & Eng. Ency. of Law, 670.)

The verdict in this case is supported by substantial testimony, and, being so supported, the ruling of the trial court denying the motion for a new trial should be affirmed. (*Ettien* v. *Drum* (Mont.), 101 Pac. 151.)

MR. JUSTICE SMITH delivered the opinion of the court.

The complaint in this action alleges that in the year 1907 the plaintiff sold to one Arthur Durand goods, wares, and merchandise of the value of $786.95; that thereafter the defendants, as copartners, agreed to pay plaintiff the said sum of $786.95 upon consideration that the plaintiff would cancel the obligation of Durand to pay such sum, and release said Durand from all liability on account thereof; that plaintiff accepted said promise of defendants as a substitute for the original promise of Durand to pay for said goods, and canceled the original obligation of Durand and released him from all liability thereunder; that on the thirtieth day of August, 1907, defendants paid the sum of $75 cash, in pursuance of the aforesaid agreement, leav-

ing a balance due from them of $711.95, no portion of which has ever been paid. The answer denies each and every allegation of the complaint. The cause was tried before the district court of Silver Bow county, sitting with a jury. Testimony was introduced on both sides, and a verdict was returned in favor of the plaintiff for the full amount demanded. Upon this verdict judgment was entered against the defendants, and from this judgment and an order denying their motion for a new trial they have appealed to this court.

The testimony shows that McDonald & Pelette had a contract for grading a section of the Chicago, Milwaukee and St. Paul Railroad Company of Montana, in Madison county, and that they sublet a portion of the work to Arthur Durand; that Durand had an account with plaintiff, and thereafter purchased of him certain hay, oats, bran, salt, and flour, to the amount of the sum mentioned in the complaint. Durand testified that he afterward had difficulty with one King, who was in charge of the horses with which the work was being done, and, on account thereof, he surrendered his contract to McDonald and Pelette and delivered to them the hay, oats, and other supplies which he had left on hand; that McDonald took a list of the property and placed a valuation upon the same. This witness said: "I asked McDonald if he would let me quit and take the stuff. He said he would. I said: 'All the bills I made down here on this contract I want you to pay them, and then what's left I want you to turn the money to me.' He said: 'All right, sir.' He said that he would, and, if anything was left, he would pay it to me. Prior to this time I had a talk with McDonald and Pelette about the amount owing to McAllister. They knew how much I owed McAllister. I asked McDonald to let me have a check for about $350. I says, 'Make it to McAllister'—on the 1st of June, I believe, or 26th of May. He said he would. I had asked them a couple of times before for a check for McAllister, to send it to him, because he was writing me to get some money. McAllister came down there afterward. I had wrote to him and told him. I wrote him what McDonald told me. In response to that letter McAllister came

over there. That was on Sunday. We saw Pelette. He said: 'To-morrow is Monday, and they expected Mrs. McDonald down to-morrow or this afternoon. She was going to take charge of the books and take care of the bills, and they would send a check for $350 on Monday or Tuesday, or probably $400'—send a check to McAllister. He said: 'A few days later will settle the balance'—that they would settle the balance. That conversation was directed to McAllister. He said: 'All right, sir. Then I am coming back.' McAllister has never asked payment of me since that day, and I have never paid him. The following receipt, which you show me, was signed by me:

"'McDonald's Camp, Lime Spur, June 12, 1907.

"'I hereby agree not to hold McDonald & Pelette responsible for any portion of the nine hundred and sixty and no/100 ($960.00) dollars for supplies and implements sold to John King for the purpose of grading on C., M. & St. P. Ry., that they will not be able to collect from him through his work on C., M. & St. P. Ry.

"'[Signed]    Arthur Durand.'

"I did not sell anything to King. I sold it to McDonald. I signed the paper you have just shown me, because three days after I sold him the stuff he came back and asked me to sign it. He kept after me, and then finally said he could get kind of a settlement quicker with the surveyor if I signed it. I objected to signing it for fifteen minutes. I did it because I thought he would keep his word. The supplies mentioned were the supplies I have said I sold to McDonald & Pelette, and the money was the money I was expecting to receive from McDonald. I do not know whether I made any money on my contract or not. I quit because King was going to quit with his horses. I had no talk at all with King about taking over my contract. McAllister wrote to me to get him some money. I might write back what McDonald wrote me—let me have a check or send him a check. McDonald did not say that, if there was anything coming to me, he would pay it over to McAllister. I asked him for $350. He said he would let me have it. I thought it was coming to me. I did not think he would let me have the money unless

it was coming. I did not expect he would pay my debts unless I had something coming. I did not expect that. The reason I expected him to pay this money, I know I had it coming. That was my opinion after my measurements. I would not ask him to pay anything for me if I did not think he owed me. McAllister asked Pelette: 'How about that check?' Pelette was to pay me or send him, because I wrote McAllister.

"Q. I just asked you what Pelette said to McAllister? A. He said he would send the check on Monday or Tuesday following, and he said he would pay the balance later.

"Q. What indebtedness was he talking about? A. About what I owed McAllister.

"Q. And what further was said at that time between McAllister & Pelette? A. That is all I heard myself.

"Q. You didn't hear anything further? A. No, sir; not that I remember.

"Q. Mr. McAllister did not tell Mr. Pelette that he was going to look to him entirely for the money, and not to you, did he? A. He did; yes, sir.

"Q. And then Pelette said further they would stand good for the money and let you go? A. Never mentioned my name at all, not after I asked him. I asked him if he remembered I asked him for a $350 check. I sent an order to McDonald & Pelette every time there was a bill to pay. They were to pay my orders out of any money coming to me. I signed the following document:

"'Butte, Montana, June 17, 1907.

"'McDonald & Pelette: Please pay to W. E. McAllister eight hundred and forty-two and 25/100 ($842.25) dollars payment to be made as fast as the money becomes due to Arthur Durand. Indorse all payments on this order and I will receipt for same.

"'W. E. McAllister.
"'Arthur Durand.'

"Mr. McAllister gave me that.

"Q. And you signed it before he did? A. He made it out before me, and I signed it.

"Q. That was long after you had quit there—June 17, 1907?
A. I had quit a day or two.

"Q. You had already signed the order for McDonald to pay you any money from King on June 12, hadn't you? A. Yes, sir.

"Q. And a moment or two ago you said you quit before that? A. I quit two days before that.

"Q. Before you signed this order, and before you came to town, McAllister had been out there, and had a talk with you and Pelette, hadn't he? A. Yes, sir.

"Q. And yet on June 17 you were giving an order on McDonald & Pelette to pay McAllister as the money came due to you? A. I signed two orders then.

"Q. I hand you another order, and ask you if you signed that one? A. Yes, sir; that is the one I was referring to. It is as follows:

" 'Lime Spur, Montana, July 10, '07.

" 'To Alex McDonald & Wm. Pelette:

" 'Please pay W. E. McAllister of Butte, Montana, the sum of $842.40 out of any moneys that may come into your possession and belonging to me upon contracts, subcontracts or in any other manner whatsoever, and charge the same to my account.

" 'ARTHUR DURAND.'

"Mr. Fitzgerald, attorney for the plaintiff, wrote that Mr. McAllister had it in his hand. After I signed it, I handed it to McDonald, or Fitzgerald did, one or the other. I did not know how much money was coming to me. I never did know. Any money coming to me was to be paid after the engineers measured up the work, made a statement. I believe it was about the 25th of May that I asked McDonald for a check for $350 for McAllister. I asked him if he would advance me—on account of high water I had to have plenty of feed—I asked him if he would let me have money to pay for it. He said he would, and it was to be charged to my account. He said he would give it to me in a few days. Under my contract with McDonald & Pelette they paid all my hired men as I give the orders. The last order given, when Mr. Fitzgerald went down with me, was

after McAllister went over to the camp, and the other was given before. When McAllister was there, he asked Pelette if he had received the orders. He said, 'Yes; there is an order here for you.' I never had any conversation with King relative to the document dated June 12, nor relative to the deal. When I signed it, McDonald said, if I would sign it, they would get a settlement with the surveyor of McIntosh Bros. and get a check, and as quick as they would get a check they would pay Mr. McAllister. I gave the second order, dated July 10, because they claimed the first one was lost. They wanted a second one to show that McAllister would be paid before anybody else, so that they could stand the other people off. McDonald asked Fitzgerald to write it. The orders I gave McDonald & Pelette were to be paid as I gave the order. I don't know what they done. The following letter was written by my sister in law at my request:

"'Butte, Mont., June 19, '07.

"'Mr. Alex McDonald, Lime Spur, Mont.

"'Dear Sir: In regard to the money order I gave you for Chas. Johnson, I wish you please give him only one hundred $140.00 instead of the amount I gave money order for. I have other bills to meet at once, so that is the cause of the change in Johnson bill. I hope this will not interfere with any of your plans, and it will do me a great favor. I will see you as soon as I can arrange matters here. With best regards, I remain,

"'Yours truly,

"'Arthur Durand.'

"I owed Johnson for tools used on the contract and had given an order on McDonald & Pelette to pay him. June 19 was quite a while after I quit there. I signed the following:

"'Charles M. Johnson,

"'Dealer in Lumber, Wagons and Buggies, Farming Implements.

"'Whitehall, Mont., ———, 190—.

"'Mr. A. McDonald, Lime Spur: I wish you would look after my bill which I sold to Mr. Durand, the bill amounts to two hundred and twenty-six 226.10. He got another wheeler after-

wards. If you will kindly inform me if everything is all right I will be greatly obliged.

" 'Yous respect.,

" 'C. M. JOHNSON.

" 'Pay above bill out of money you will receive from Jno. King on my account.

" 'A. DURAND.'

"That was the money for the stuff I gave McDonald. I suppose he turned it over to King. I went to McDonald, and told him King was going to quit. I said I would sell them the stuff, and they could do as they pleased. I was not on good terms with King for three weeks. My arrangement was to sell to McDonald. I did not sell it to King.

"Q. You had no understanding that it was to be transferred to King? A. Not at the time they took the stuff.

"Q. Then, why this last order—the money coming to me from King? A. That I don't remember at all."

The plaintiff testified: "Durand introduced me to Pelette. I asked what was the reason he wasn't getting the money up to me. He said he had been very busy; that they were expecting Mrs. McDonald out to take charge of the books, and they would get the first payment out—said they would send $350 right away, perhaps the next day, not later than Tuesday—forward that check; that they had taken over the Durand outfit and got everything settled up, so that they could wipe out the Durand accounts, pay them up, and everything was all right, everything Durand owed they were going to settle it up, they would send me one check not later than the following Tuesday, at least $350, and send the balance of the money in a few days. Durand told me he had turned the outfit over to defendants. They sent me no check, and have paid no portion of the account. I talked to Pelette about the order which I wrote myself. I asked him if they had received the order, and he said they had. We got $150 that fall, later on, for something. I don't know what it was. I guess there was something there. I think Durand turned it over to Frank Andrus, of the Keystone Grocery, with the understanding that I and the Keystone Grocery

should share in it; and whatever I got was to apply on the account—part to me and part to the Keystone Grocery. They gave me a check for one-half of that $150.

"Q. Now, then, after you had that arrangement with Durand and Andrus, you executed this paper of date August 30, did you? A. I guess that's the date. I don't know. That must be correct. I don't remember what that outfit was. It is described. in there, as near as I can tell. This latter document is as follows:

"'Butte, Mont., Aug. 30th, '07.

"'We have this day sold to McDonald & Pelette 4 Western Wheelers No. 211½, one small plow, 4 tents, cooking utensils, cooking and heating stoves, 3 scraper slips, consideration $150, receipt of payment is hereby acknowledged.

"'F. B. Andrus.

"'W. E. McAllister.'

"The arrangement was that whatever that outfit was, and whatever was received from it, was to be shared between me and Andrus. That is the only $75 I ever got from McDonald & Pelette. After I went to Lime Spur, I never presented a bill to Durand. I knew Durand went through bankruptcy, and I presented no claim. I never looked to him. I looked to defendants to pay me, because they guaranteed to pay the bill. There is no charge on my books against McDonald & Pelette. It was a straight business proposition. I expected to get my money on the June 17 order."

Alexander McDonald, one of the defendants, testified that at the time Durand relinqu'hed his contract he was indebted to the firm of McDonald & Pelette in the sum of about $200. This witness continued: "Durand came over where I and Pelette was working, and said that he and King wasn't on good terms; that King was going to take his teams, and wanted me to go over and take an invoice of all the stuff, and quit. He said: 'Turn it all over to King. Let him keep it all' to secure him on the contract, as King went ahead with the work, as the payments were made. I told him all right. I went over and took

the invoice with him, put his own price on everything, and he turned around and signed the receipt to clear us—that he didn't hold us responsible for anything unless it was coming through King. He told me to turn it over to King, turn everything over to King, because he couldn't do it himself. They were not on speaking terms. I turned it over to King. Durand left the stuff, the outfit, on the ground. As to what became of that outfit—there was another outfit figuring on coming in there. They wanted some tools and tents, and they wanted us to buy them for them. I came in and seen Durand on the street and wanted to buy the stuff off him. He said: 'I haven't got nothing to do with it. I turned it over to the Keystone Grocery Company and McAllister, and you will have to go and see them about it.' I paid Andrus and McAllister $150 for the outfit, and they gave me a receipt for $75 apiece.''

Pelette testified: "McAllister came along there, him and Durand, and Durand introduced McAllister; and so he asked me about this order, and I told him I didn't have much business about the likes of that, but that my partner, I believe, was in Butte that day, and that his wife would be out on Monday and would take charge of the books, and anything that Mr. Durand had coming, if he had anything coming, that we would send in a check right away, as soon as the books were straightened up. I have reference to an order from Mr. Durand to pay Mr. McAllister out of any money coming to him. It was the first order. I don't remember what McAllister said in reply. He did not have long to talk.''

1. It was contended in oral argument in this court by the respondent that we ought not to consider the appeal from the order denying a new trial on the merits for several reasons, the chief one of which is that the record does not disclose that the notice of intention to move for a new trial was ever served. The other objections are extremely technical, and we are of opinion that there is no merit in any of them. We also think that the one specially noted above should be overruled. The record discloses that "the motion for a new trial was duly presented to the court upon the said notice and argued thereon, and was

by the court denied''; also, that on April 10, 1909, counsel for the plaintiff accepted service of the proposed statement of the case for use on appeal, without objection, but afterward indorsed thereon, as a special objection, a note of the fact that the statement received did not contain five certain pages which were inserted by counsel for defendants on April 14, 1909, and served. This statement was afterward settled and signed as correct by the trial judge. The printed brief filed in this court contains no reference to the matter urged in oral argument, and the cause was argued on the merits before the objections were raised. Under these circumstances, we shall presume that the motion for a new trial was argued by counsel for both parties, and that, if the notice was not properly served, the point was waived in the court below. (See *Kenyon-Noble Lumber Co. v. School District, ante,* p. 123, 105 Pac. 551.) The objections urged by the respondent serve the same purpose as a motion to dismiss the appeal, and we are averse to dismissing appeals without a hearing on the merits, unless it affirmatively appears that this court is without jurisdiction, or there has been a flagrant violation of the rules of the court.

2. The only question presented by the appellants is whether the evidence is sufficient to show a contract by novation between the parties. Novation is the substitution of a new obligation for an existing one. (Revised Codes, sec. 4958.) Novation is made (1) by the substitution of a new obligation between the same parties, with intent to extinguish the old one; (2) by the substitution of a new debtor in place of the old one, with intent to release the latter; or (3) by the substitution of a new creditor in place of the old one, with intent to transfer the rights of the latter to the former. (Revised Codes, sec. 4959.) Novation is made by contract, and is subject to all the rules concerning contracts in general. (Revised Codes, sec. 4960.) To constitute a novation by substitution of creditors or debtors, there must be a mutual agreement between three or more parties, whereby a debtor in consideration of being discharged from his liability to his original creditor contracts a new obligation in favor of a new creditor. (29 Cyc. 1131.) To con-

stitute a novation, the creditor must have consented to the discharge of the original debtor, and have accepted the promise of the new debtor. It is not essential that the assent to, and acceptance of, the terms of novation be shown by express words to that effect, but the same may be implied from the facts and circumstances attending the transaction and the conduct of the parties thereafter. A novation, like other valid contracts, must be supported by a consideration, which in this case is the discharge of the original debt. If the agreement does not, and was not intended to, operate as a release of the original debt, it is not a novation. (29 Cyc. 1132, 1133, 1134.)

We are of opinion that the motion for a new trial should have been granted. The only testimony tending in the slightest degree to indicate that the parties agreed or intended that Durand should be discharged was brought out on his cross-examination. After he had narrated the entire conversation between McAllister and Pelette, without a suggestion that the latter agreed to do anything more than pay the order theretofore given, he was asked by counsel for the defendants: "McAllister did not tell Pelette that he was going to look to him entirely for the money, and not to you, did he?" He answered: "He did; yes, sir." Prior to this he had stated positively that he had given the entire conversation. McAllister does not claim that any such agreement was had, and Pelette's version of the transaction does not include it. A consideration of the prior and subsequent actions of the parties convinces us that the great weight of the evidence negatives the idea that any such statement was made by the respondent. Prior to the time when McAllister interviewed Pelette, Durand had instructed the appellants to pay respondent the sum of $842.25 as fast as the money became due him; and, after the interview was had, he duplicated the order, stating specifically that the amount was to be paid out of any moneys coming to him upon his contract. The latter order was written by plaintiff's attorney. According to the testimony of Durand, almost the first question addressed to Pelette by McAllister was whether he had received the orders, and this witness also testified that he thought he had the money coming,

and did not expect that appellants would pay anything unless the money was due upon his contract. Even though it be conceded that McAllister made the remark testified to by Durand, the record is still barren of evidence to the effect that Pelette assented to the arrangement. It is also worthy of remark that Durand in one part of his cross-examination testified that the order of June 17 was executed after McAllister had seen Pelette, and was written by the respondent himself. The testimony also shows, to our satisfaction, that the reason for giving the duplicate order of July 10 was to enable McAllister to obtain a preference in point of time of payment over other creditors of Durand. As Durand said, "so they could stand the other creditors off." We find no justification for concluding from the testimony that Durand's statement that he did not turn his supplies over to King is true. His subsequent acts all negative the idea. If he is correct, then the appellants in consideration of the receipt of his property had agreed to pay all of his debts; and yet on June 19 he instructed them not to pay Johnson in full, for the reason that he had other bills to meet. On June 12 he agreed not to hold appellants responsible for any portion of the sum of $960 "for supplies and implements sold to King, * * * that they will not be able to collect from him through his work," and he afterward instructed them to pay Johnson's bill "out of money you will receive from John King on my account." When asked why this last order was given, if he had no understanding that the property was to be transferred to King, he replied that he did not "remember at all." According to all of the testimony, it appears to have been considered necessary that Mrs. McDonald should arrive and take charge of the books before McAllister could receive anything; but no such necessity existed if appellants had in fact bound themselves by a contract of novation. Added to all of the foregoing, we have the fact that, when McDonald went to Durand to purchase some of the implements left at the construction camp, he was informed that the property had been turned over to McAllister and the Keystone Grocery Company, from whom he afterward purchased it and received a receipt

signed by the respondent. The testimony of the latter that he looked to the appellants to pay him ''because they guaranteed to pay the bill,'' and ''I expected to get my money on the June 17 order,'' is almost conclusive against the contention that a novation took place. The intent on the part of McAllister to release Durand from his original obligation is a vital element going to make up a novation. (See *Carpy* v. *Dowdell*, 131 Cal. 495, 63 Pac. 778; *Hanson* v. *Nelson*, 82 Minn. 220, 84 N. W. 742; *J. I. Case Threshing Machine Co.* v. *Olson*, 10 N. D. 170, 86 N. W. 718; *Johnson* v. *Rumsey*, 28 Minn. 531, 11 N. W. 69.)

In the case of *Lemans* v. *Wiley*, 92 Ind. 436, the court said: ''The rule that this court will not reverse a judgment when the evidence tends to sustain the verdict or finding does not go so far as to authorize an affirmance upon an isolated statement of a witness which is in conflict with other statements of the same witness.'' The supreme court of Wisconsin in *Wunderlich* v. *Palatine Ins. Co.*, 104 Wis. 395, 80 N. W. 471, said: ''When it appears that the trial court has sustained a verdict upon testimony contrary to the great weight of the evidence, and which is impeached or rendered improbable by other conceded facts in the case, or is against all the reasonable inferences or probabilities of the case, this court is bound to, and will, interfere for the relief of the aggrieved party.'' In *Roberts* v. *Agnew* (Tex. Civ. App.), 103 S. W. 1178, the court of civil appeals of Texas used this language: ''It is undoubtedly the duty of an appellate court to award a new trial where the verdict, though not entirely without evidence to sustain it, is so utterly at variance with the real and unexplained facts as that the court can say it is clearly wrong.'' (See *Jackson* v. *McNatt*, 4 Neb. (Unof.) 55, 93 N. W. 425.) In the case of *Howie* v. *California Brewery Co.*, 35 Mont. 264, 88 Pac. 1007, this court held that certain statements of witnesses as to the location of a party-wall should be disregarded, where it was apparent from all of their testimony that they had no facts upon which to base their assertion. (See, also, *Hamilton* v. *Monidah Trust*, 39 Mont. 269, 102 Pac. 335.)

We think the record discloses beyond a reasonable doubt that the parties did not agree that McDonald and Pelette should be substituted in place of Durand, with intent to release the latter, and the order and judgment appealed from are reversed. As there was no motion for a nonsuit or for a directed verdict, a new trial is ordered.

*Reversed and remanded.*

MR. CHIEF JUSTICE BRANTLY and MR. JUSTICE HOLLOWAY concur.

