CASEY, RESPONDENT, *v.* NORTHERN PACIFIC RY. CO., APPELLANT.

(No. 4,327.)

(Submitted April 12, 1921.   Decided May 16, 1921.)

[198 Pac. 141.]

*Personal Injuries—Railroads—Master and Servant—Evidence—Insufficiency—New Trial—Refusal—Abuse of Discretion—Appeal and Error—Verdict—Conflict in Evidence—Rule—Distances—Estimates—Exact Measurements Controlling.*

Personal Injuries—Railroads—Master and Servant—Evidence—Insufficiency.

1. In an action for injuries sustained by a locomotive engineer who jumped from his engine just before it collided with a train ahead of him, plaintiff's testimony, which contradicted itself as to essential details, which was contradicted by his own witness and by the harmonious testimony of the other employees offered by defendant, and much of which was inherently improbable, *held* insufficient to sustain a verdict in his favor.

Same—Appeal and Error—Conflict in Evidence—When Verdict not Conclusive.

2. The rule that a verdict returned upon conflicting evidence and approved by the trial court by its order denying a new trial, will not be disturbed on appeal if there is some substantial evidence to support it, has reference to real conflicts arising between testimony introduced by plaintiff and that given by opposing witnesses, and not to conflicting statements made by himself or those of his witnesses.

Same—Jury may not Arbitrarily Disregard Unimpeached Testimony.

3. Juries may not arbitrarily and capriciously disregard the testimony of witnesses which is unimpeached in any of the usual modes known to the law and supported by all the circumstances in the case.

Same—New Trial—Insufficiency of Evidence—Refusal, When Error.

4. The advantageous position occupied by the jury and the lower court in weighing the testimony of witnesses who appear before them in a personal injury action does not prevent a reversal of the order denying a new trial on the ground of insufficiency of the evidence, where the testimony supporting the verdict is highly improbable or incredible or is inherently impossible in view of the physical facts.

Same—When Physical Facts Controlling Over Testimony.

5. Where physical conditions surrounding an accident point so unerringly to the truth as to leave no room for a contrary conclusion based on reason or common sense, the mere fact that testimony is introduced in conflict with them is not sufficient to make a case for the jury.

5. Testimony contrary to physical facts as withdrawable from jury, see notes in 15 Ann. Cas. 1190; Ann. Cas. 1917B, 475.

[60 Mont. 56.]

Same—When Court may Disregard Unimpeached Testimony.

6. A court may reject the most positive testimony of a witness though not discredited by direct evidence impeaching him or contradicting his statements, where his story is inherently improbable, creditable swearing only concluding its judgment.

Same—Appeal and Error—Verdict—Sufficiency of Evidence—Self-contradictory Statements of Plaintiff—How Viewed on Appeal.

7. In determining whether plaintiff's testimony is sufficient to support a verdict in his favor, his case may be judged by that portion of his self-contradictory testimony which is least favorable to him.

Same—New Trial—Refusal—When Abuse of Discretion.

8. Where plaintiff in a personal injury action wholly failed to make out a case, and the testimony of defendant's witnesses did not supply the defects, the court abused its discretion in denying a motion for new trial.

Same—Evidence—Estimates of Distances—Exact Measurements Controlling.

9. Under the rule that proof of actual measurements is so far superior to an estimate of distances that no issue for the jury is raised by a conflict between the two, measurements made by a civil engineer between points on a railway track an exact determination of which was vital in the trial of an action by a locomotive engineer who was injured by a collision were controlling over mere estimates made by plaintiff who by his testimony had demonstrated that he was without capacity for judging distances or colored his statements to meet the exigencies of his case.

*Appeal from District Court, Gallatin County; Ben B. Law, Judge.*

ACTION by William B. Casey against the Northern Pacific Railway Company. Judgment for plaintiff, and defendant appeals from the judgment and from an order denying its motion for new trial. Reversed, with directions to dismiss the complaint.

*Mr. W. S. Hartman* and *Messrs. Gunn, Rasch & Hall,* for Appellant, submitted a brief; *Mr. E. M. Hall* argued the cause orally.

The only testimony that even tends to justify the verdict is that of the plaintiff himself. If the unsupported testimony of this vitally interested witness is in direct conflict with prior statements of such witness and is impeached and rendered

6. Weight of uncontradicted testimony, see notes in 4 **Ann. Cas.** 982; 12 **Ann. Cas.** 245.

improbable by the conceded facts and circumstances in the case, and also by undisputed physical conditions, then there is no substantial conflict between his testimony and that of the defendant. Under such circumstances, the case is governed by the decisions of this court in the following authorities: *McAllister* v. *McDonald*, 40 Mont. 390, 106 Pac. 882; *Escallier* v. *Great Northern Ry.*, 46 Mont. 238, Ann. Cas. 1914B, 468, 127 Pac. 458; *Rood* v. *Murray*, 50 Mont. 240, 146 Pac. 541; *Nelson* v. *Big Blackfoot Mill. Co.*, 17 Mont. 553, 44 Pac. 81. See, also, the following cases where the plaintiff's testimony was so far impeached and discredited that the appellate court held that there was no substantial conflict in the evidence: *Glennon* v. *Erie R. Co.*, 86 App. Div. 397, 83 N. Y. Supp. 875; affirmed in 180 N. Y. 562, 73 N. E. 1124; *Houghton* v. *Loma Prieta Lumber Co.*, 152 Cal. 574, 93 Pac. 377; *Cyr* v. *Landry*, 114 Me. 188, 95 Atl. 883; *International etc. R. Co.* v. *Brice* (Tex. Civ. App.), 111 S. W. 1094; also, note to case of *McCarthy* v. *Bangor etc. Ry. Co.*, L. R. A. 1915B, 140.

*Messrs. Miller, O'Connor & Miller*, for Respondent, submitted a brief; *Mr. James F. O'Connor* argued the cause orally.

MR. JUSTICE HOLLOWAY delivered the opinion of the court.

On the evening of March 1, 1917, Northern Pacific freight train No. 1713, westbound, left Winston at 8:03 for East Helena, followed immediately by engine No. 1288, which had assisted the train from Townsend to Winston, and at the latter place had been cut off. The distance from Winston to East Helena is 15.9 miles, but on account of train troubles No. 1713 did not reach the East Helena yard limits until 8:52. The train was required to take the siding and moved to and a few feet past the switch before it came to a stop. There were some sixty-four cars in the train, and the caboose stood a short distance east of the yard limit board. Engine 1288 stopped from

forty-five to fifty feet east of the caboose. Twenty-six minutes after train 1713 left Winston, another west-bound freight No. 1746, also left Winston for East Helena, with a load of 1,550 tons (twenty-eight loaded cars and six empties), and somewhere near 9 o'clock ran into engine 1288, forcing it forward into the rear of train 1713. Just before the collision, William B. Casey, the engineer in control of train 1746, jumped from his locomotive, fell and sustained injuries. He brought this action to recover damages, and charged the railway company with negligence in failing to give timely warning that train 1713 was standing upon the main line track and extending eastward of the yard limit board.

The answer denies any negligence on the part of the company, or its agents and servants in charge of train 1713, and alleges negligence on the part of the plaintiff in approaching the yard limit board at an excessive rate of speed. The trial resulted in a verdict in favor of plaintiff, and from the judgment entered thereon and from an order denying a new trial defendant appealed.

Of the several assignments of error but one requires consideration. Is the evidence sufficient to sustain the verdict?

It is established by the evidence without controversy that it [1] was the duty of the rear brakeman on train 1713 to exercise reasonable care to give full protection to train 1746 by warning signals; that he did warn it with his lighted lantern and a lighted fusee, and that the signals were seen by the plaintiff before the collision occurred; that it was the duty of plaintiff to approach the yard limits with train 1746 under such control that he could stop if necessary; and that plaintiff knew that he was required to take the East Helena siding to permit train 222 to pass upon the main line track.

It is conceded that a considerable distance east of the yard limit board the track runs through a cut; that west of the cut the track curves to the south, then runs straight for some distance, and then curves slightly to the north; and that plaintiff

could not see the rear lights on train 1713 or on engine 1288 until he reached the straight track.

In order to determine whether the brakeman was negligent in failing to warn plaintiff at a sufficient distance from engine 1288 that by the exercise of ordinary care train 1746 could have been stopped and the collision avoided, the answer to each of the following inquiries is of primary importance: (a) Where was the rear end of train 1713 with reference to the yard limit board, and where was engine 1288 when the collision occurred? (b) Where was the brakeman when train 1746 came into view? (c) Where does the straight track begin from the east? (d) Where is the cut referred to in the evidence? (e) How far was plaintiff from engine 1288 when the signals were first seen? (f) At what rate was plaintiff running his train?

(a) In his complaint plaintiff alleges that the rear end of train 1713 was seventy-five feet east of the yard limit board, and again he alleges that it was 275 feet east of that point. Upon the trial he testified that it was five car-lengths east of the yard limit board and that the cars average fifty feet in length. He alleges that the rear of engine 1288 was 350 feet east of the board, and that his train collided with it 400 feet east of that point.

(b) Plaintiff testified that he saw the lighted fusee in the brakeman's hand and the rear lights on engine 1288 at the same instant; that when he first saw these signals the brakeman was four or five car-lengths east of the rear of engine 1288 and was going east. Later he testified that immediately after the collision he met the brakeman four car-lengths east of the front of train 1746. The undisputed evidence is that the impact drove the caboose of train 1713 westward to the yard limit board a distance of 250 feet according to plaintiff's testimony, so that, if the second statement above is true, the brakeman was not as far east when the collision occurred as he was when plaintiff first saw him, though he was traveling eastward all the time. At an investigation held at Livingston four days after

the collision, at which the train crews were present and several witnesses, including the plaintiff, were examined touching the cause of and responsibility for the collision, the plaintiff then stated that immediately after the collision he met the brakeman about the middle of train 1746, and he testified that the train consisted of thirty-four cars. At the same investigation he testified: "I say Brakeman Moorehead was not over ten car-lengths behind helper" (engine 1288).

(c) Plaintiff contented himself with giving estimates of the distances. He did not undertake to locate definitely the point where the straight track commences from the east, but inferentially he fixed it at 350 feet east of the rear of engine 1288, for he testified that he saw the signals when he first came upon the straight track, and that he was then seven car-lengths from engine 1288. By actual measurements the distance from the yard limit board to the point where the straight track commences from the east is 1,600 feet in round numbers. If the rear of engine 1288 was 350 feet east of the yard limit board, as alleged in plaintiff's complaint, then the straight track actually commences 1,250 feet east of the rear of engine 1288, instead of 350 feet, as estimated by plaintiff.

(d) Plaintiff also estimated that the rear of engine 1288 was twenty car-lengths, or 1,000 feet, west of the cut. The measurements disclose that the distance between the west end of the cut and the rear of engine 1288 is 2,326 feet, assuming that engine 1288 was stationed at the point fixed by plaintiff in his own testimony. Plaintiff testified that the cars average fifty feet in length, but a check of his own train from the wheel report disclosed that they averaged forty-four and three-tenths feet in length.

(e) Plaintiff alleges in his complaint that when he first observed the signals or received warning that a train was on the main line track east of the yard limit board he was only 150 feet from the rear of that train. Upon the trial he testified first that he was seven car-lengths away, and later testified that

he was eleven car-lengths away when he jumped from his engine, and that he jumped after he observed the signals and after he had set the brakes. At the investigation at Livingston he stated that he did not believe that he was over fifteen or sixteen car-lengths away. Marchington, the fireman on Casey's locomotive and a witness for plaintiff, testified that the brakeman was fifteen or sixteeen car-lengths away when he first saw the signals. If the brakeman was four or five car-lengths east of the rear of engine 1288, as plaintiff testified, then train 1746 was from nineteen to twenty-one car-lengths from engine 1288 when the signals were first seen.

(f) Plaintiff testified that he had exceeded thirty miles per hour on straight track after he left Winston. At Livingston he stated that he averaged about twenty-eight or twenty-nine miles per hour from Placer, through Louisville and to the cut. Upon the trial he testified that when he first applied the brakes in the cut he was going twenty miles per hour, and later testified that he was running twenty-five miles per hour, and again that when he applied the brakes he reduced his speed to twenty-five miles per hour. He testified that when he first saw the signals he had reduced his speed to fifteen miles per hour and could have stopped his train and avoided the collision if he had had eleven car-lengths distance within which to do it. He also testified that he was eleven car-lengths away from engine 1288 when he jumped, and that he jumped because he saw he could not stop in time to avoid the collision, and that, with the brakes set, his train was still going about six miles per hour when it struck engine 1288. He also testified that, if his train had been running twenty-five miles per hour, he could have stopped in eighteen or nineteen car-lengths (900 to 950 feet), but he failed to stop within 1,250 feet or twenty-five car-lengths.

Whatever other controversy may arise over the rate at which train 1746 was traveling when the collision occurred, the fact remains that the impact was sufficient to practically destroy

engine 1288 and to drive it forward (though the brakes on it were set), demolishing the caboose and one car in train 1713, derailing five or six other cars, and carrying the broken caboose to the yard limit board, a distance of 275 feet according to plaintiff's own theory.

Plaintiff testified that the brakeman was only four or five car-lengths east of the rear of engine 1288 and should have been back seven car-lengths farther than he was "to have flagged my train so as to give me time in which to stop. * * * If he had been eleven cars back of the rear engine No. 1288, I could have stopped my train." Again he testified that the brakeman should have gone "beyond the cut to have given us the necessary advice as to the position of the train on the main line." The first statement would place the brakeman 550 feet east of the rear of engine 1288; the last one would require him to be approximately half a mile from that point.

Plaintiff testified that after the collision he went to his locomotive "and stayed on it until it was towed into Helena." Later he admitted that his locomotive "was in shape so that it could go on its own power"; and it is admitted that his engine did go into Helena on its own power and pulled train 1746.

During the first day of the trial of this case plaintiff was examined at length by his own counsel and cross-examined by counsel for the railway company, during which examination he referred to the fact that immediately after the collision he had a conversation with the brakeman, but did not tell what was said. On the second day of the trial he was recalled by his counsel and then testified as follows: "When I got up after that fall, I started for my engine, and as I was on the way to the engine I met the flagman of train 1713 west, between where I got up and the rear end of their train, about four car-lengths from the head end of my engine. I had a conversation with the flagman at this time; I said to him, 'Why didn't you get back to stop me?' and he said, 'I would, but I didn't know what we were doing here.' He said, 'We expected to move

every minute, and when I saw you coming I beat it back.' That was the excuse he gave me for not getting back to flag us.'' When asked why he had not given this testimony the previous day while he was on the witness-stand, he replied, ''I was never asked the question.'' At the investigation at Livingston he testified that he had the conversation with the brakeman, but his version of the conversation then was as follows: ''I talked to him and asked him why he gave me such a short flag, and then I walked to the head end.''

Although no complaint is made in the pleadings of the braking apparatus on train 1746, plaintiff testified that when he set the brakes preparatory to jumping ''the emergency didn't work; * * * the braking apparatus on the train was not in good shape.'' At the investigation at Livingston he stated that he had a very good braking train, had no trouble stopping it at any place, and that the brakes handled the train very well. Plaintiff admitted that the investigation was held at the time and place mentioned; that he was present and examined as a witness; that the questions were asked by the superintendent and the evidence taken by the stenographer. He does not deny that he made the answers given above. He testified: ''I was in such pain when I was up there and I was sick, and I don't remember what I did say.'' He admitted that soon after the investigation he was discharged by the railway company, the reason assigned being his ''action in the collision at East Helena,'' but he assumed to assign a different reason as the one which actually prompted his discharge.

So far as any attempt was made to sustain the charge of negligence against the crew of train 1713, the plaintiff's testimony stands alone. The evidence for defendant may be stated briefly as follows: Grannis, the conductor on train 1713, testified that as soon as his train came to a stop he sent Brakeman Moorehead back east with a lantern and lighted fusee to signal train 1746; that the flagman was ten or twelve car-lengths east of the rear of train 1713 when he met engine 1288; that he

[60 Mont. 56.]

was about thirty car-lengths away when train 1746 came in sight; and that he (the witness) walked forward along his train thirty car-lengths after it stopped and before the collision occurred.

Jones, the engineer on 1288, testified that he met the flagman about twelve car-lengths east of the caboose of train 1713; that he answered the signal and spoke with the flagman; that the flagman continued on eastward and was about the "point of the curve" when train 1746 came in sight; that when he first saw the signal at about the mile-post he had his fireman drop a lighted fusee on the track, but it fell into soft snow and was smothered, and he had another—a yellow light—dropped, and it continued to burn. Barton, the fireman on 1288, testified to the same facts.

Cole, the conductor on 1746, testified that he was sitting in his caboose when the collision occurred; that he immediately went to the west door of the caboose and looked out and saw the flagman from two to five car-lengths west of him. Cole's train consisted of thirty-four cars and occupied 1,550 feet of track, so that, if his testimony is true, the flagman was from twenty-six to thirty car-lengths east of the point of collision when the trains came together.

Moorehead, the brakeman and flagman, testified that immediately after train 1713 stopped he started back with a lantern and lighted fusee; that he met engine 1288 when he was ten or twelve car-lengths east of the rear of train 1713; that he spoke with Engineer Jones and kept on going; that he saw the fusee thrown out by 1288, and that he was from thirty to thirty-five car-lengths from his own caboose when train 1746 passed him; that he received no recognition of his signal from Engineer Casey and threw his fusee at the cab window as the engine passed; that he was about two car-lengths west of the caboose on train 1746 when the collision occurred; that he went forward and talked with Conductor Cole and then started back west; that he met Casey about the middle of train 1746; that

60 Mont.—5

Casey "asked me if I was flagging, and I told him that I was, and he said, 'Couldn't you get back any farther to stop me?' and I said, 'I got just as far as I could get with the time I had, Casey.' That is all the conversation we had at that time." He denied that the conversation as given by plaintiff at the trial ever occurred, and testified that at the investigation plaintiff had not mentioned that conversation.

Caldwell, the engineer on train 1713, testified that, when he stopped his train, he looked back and saw the flagman going east with a lighted fusee.

Le Van, a traveling engineer or road foreman, was riding with engineer Caldwell on the locomotive pulling train 1713. He testified that after train 1713 come to a stop and after train 1746 came through the cut he looked back and saw two burning fusees, one red one and one yellow; that the red one was farthest from him and was "away back."

The testimony discloses without substantial controversy that from five to eight minutes elapsed between the time train 1713 came to a stop and the collision occurred, and that the ground was covered with snow about eight inches deep.

In rebuttal Marchington testified that he did not see the yellow fusee thrown from engine 1288.

Counsel for plaintiff insist that the evidence is conflicting, [2, 3] and, since the jury found upon the issues and the lower court denied a new trial, this court is without authority to interfere, but the principal conflicts arise upon the plaintiff's own testimony, rather than in the testimony of opposing witnesses. Of the testimony of the witnesses for defendant it is sufficient to say that it is harmonious, and reasonable and consistent with physical facts, but the jury disregarded it altogether and must have based the verdict solely upon the surmises, the guesses and estimates of the plaintiff.

In *Haddox* v. *Northern Pac. Ry. Co.,* 43 Mont. 8, 113 Pac. 1119, this court said: "Juries may not arbitrarily and capriciously disregard testimony of witnesses, not only unim-

peached in any of the usual modes known to the law, but supported by all the circumstances in the case.''

It is the general rule that an order denying a new trial upon the ground that the evidence is insufficient to sustain the verdict will not be reversed where the evidence is conflicting, if there is some evidence to support the verdict; but the rule has its foundation in the assumption that the conflict is real and the supporting evidence is substantial.

In *Driscoll* v. *Market Street Cable Ry. Co.,* 97 Cal. 553, 33 Am. St. Rep. 203, 32 Pac. 591, the supreme court of California said: ''When a jury catches at a semblance or pretense of evidence for the purpose of somewhat equalizing financial conditions by taking money away from one party and giving it to the other without legal cause, the trial judge should, without hesitation, set the verdict aside; and in the event of his not doing so, this court will grant a new trial.''

Primarily, it is the province of the jury to pass upon the credibility of the witnesses and the weight to be given to their testimony, but the determination of the jury is not conclusive. Insufficiency of the evidence is a statutory ground for a motion for a new trial (sec. 6794, Rev. Codes), and in passing upon the motion it is the duty of the trial court to weigh the evidence, and, if it is not sufficient to sustain the verdict, a new trial should be ordered (*Mullen* v. *City of Butte,* 37 Mont. 183, 95 Pac. 597), and, if it is not, the appellate court must then determine whether there is substantial evidence to warrant the verdict and will not abdicate its authority in favor of the jury's findings. Jurors are subject to the ordinary infirmities of human nature, and cases are sometimes presented wherein justice would be denied if the courts failed to interfere.

We are not unmindful of the advantageous position occupied [4] by the jury and the lower court in having the witnesses before them, in hearing them testify, and observing their demeanor; but, though the appearance of a witness is an aid in judging his credibility, it is not an infallible one. Dissim-

ulation is often difficult to detect, and falsehood is often clothed in the garb of truth. Whenever the surrounding circumstances make the story of a witness highly improbable or incredible, or whenever the testimony is inherently im-
[5]   possible, a new trial should be ordered. Physical conditions may point so unerringly to the truth as to leave no room for a contrary conclusion based on reason or common sense, and under such circumstances the physical facts are not affected by sworn testimony which in mere words conflicts with them. (*Groth* v. *Thomann,* 110 Wis. 488, 86 N. W. 178.)

The corollary of the first rule above is stated cogently in *McAllister* v. *McDonald,* 40 Mont. 375, 106 Pac. 882. It was there held that the supreme court is not authorized to affirm an order denying a new trial: (a) Where the evidence tending to support the verdict is an isolated statement of a witness which is in conflict with his other statements; or (b) when the verdict is contrary to the great weight of the evidence, and the evidence which tends to sustain the verdict is impeached or rendered improbable by conceded facts, or is against all reasonable inferences or probabilities of the case; or (c) when the verdict, though supported by some evidence, is so utterly at variance with the real and unexplained facts that the court can say that it is clearly wrong.

The rule has been stated repeatedly in this jurisdiction that
[6]   a court may reject the most positive testimony, though the witness be not discredited by direct evidence impeaching him or contradicting his statements. The inherent improbability of his story may deny it all claims to respect. (*McIntyre* v. *Northern Pac. Ry. Co.,* 56 Mont. 43, 180 Pac. 971; *Landsman* v. *Thompson,* 9 Mont. 182, 22 Pac. 1148; *Mattock* v. *Goughnour,* 11 Mont. 265, 28 Pac. 301.) The credulity of courts is not to be deemed commensurate with the facility or vehemence with which a witness swears. "It is a wild conceit that any court of justice is bound by mere swearing. It is swearing creditably that is to conclude its judgment." (*The Odin,* 1 Rob. Adm.

248; *Daniels* v. *Granite Bi-Metallic Co.*, 56 Mont. 284, 184 Pac. 836.)

It cannot be unfair to this plaintiff to deal with his case from [7] the standpoint of his own statements. A party testifying in his own behalf has no right to be deliberately self-contradictory, and whenever he is so the courts are justified in judging his case from that version of his testimony which is least favorable to him. (*Atlanta R. etc. Co.* v. *Owens*, 119 Ga. 833, 47 S. E. 213.)

In his testimony given upon the trial of this case the plaintiff [8] contradicted himself repeatedly; contradicted the allegations of his verified complaint; was contradicted by his previous statements, by the physical facts, by every one of defendant's witnesses, and by his own witness, Marchington. Some of his declarations are too transparent to be entitled to credence, are improbable upon any supposition short of actual mental imbecility.

The correct answer to every one of the inquiries suggested in the early part of this opinion is of vital consequence, and yet we undertake to say that the jury could not find an intelligent answer to any one of them in the testimony produced by the plaintiff, and, since the verdict finds no support in the testimony of defendant's witnesses, it is without substantial evidence to sustain it, and the trial court abused its discretion in denying the motion for a new trial.

Plaintiff contented himself with giving estimates and demonstrated that he was without capacity for judging distances, or [9] deliberately colored his testimony to meet the supposed exigencies of his case.

Erickson, a civil engineer and a witness who testified upon the trial of this case, measured the distances along the track and prepared a map which was introduced in evidence and which shows the distances between the points in controversy. In an exhaustive note to *Lalor* v. *City of New York*, reported in Ann. Cas. 1916E, 572, the rule deduced from the authorities

is stated as follows: "It is generally agreed that proof of an actual measurement is so far superior to an estimate of the distance that no issue for the jury is raised by a conflict between the two."

The judgment and order are reversed, and the cause is remanded to the district court, with directions to dismiss the complaint and enter judgment in favor of defendant for its costs.

*Reversed.*

MR. CHIEF JUSTICE BRANTLY and ASSOCIATE JUSTICES REYNOLDS, COOPER and GALEN concur.