CULLEN, RESPONDENT, *v.* PESCHEL, APPELLANT.

(No. 8311.)

(Submitted April 6, 1943. Decided September 23, 1943.)

[142 Pac. (2d) 559.]

*Mr. F. N. Hamman,* for Appellant,

*Mr. Lloyd I. Wallace,* for Respondent,

MR. JUSTICE ADAIR delivered the opinion of the court. From a judgment on verdict for plaintiff the defendant ap-

pealed, contending that the evidence is insufficient to sustain the verdict and judgment and that the verdict of $2,500 is excessive.

The action is a civil suit for damages commenced by plaintiff for an alleged assault which she alleged was made upon her by the defendant on or about the 9th day of September, 1940.

The plaintiff was then an elderly married woman about 52 years of age and quite deaf. She was a chiropractor, with a two-room office on the second floor of the Resner Hotel in the town of Ronan. This office she also used for her living quarters.

The defendant was a young married man about 27 years of age, who resided in Ronan with his wife and infant son. He was engaged in the business of buying and selling cattle.

Sometime before the evening in question the plaintiff approached the defendant in an endeavor to sell him a house near Round Butte which plaintiff claimed to own. Thereafter the defendant inspected the house and then talked further with the plaintiff about it, but they were unable to agree on a price, so there was no sale.

On another occasion plaintiff unsuccessfully sought to obtain from the defendant a loan of money with which to build a house.

Plaintiff testified that in September, 1940, "about the ninth, something near that, but I can't be sure what date" at about 9 o'clock in the evening while she was sitting in the back room of her office the defendant came there; that she spoke to him engaging in "just an ordinary conversation like I would anybody else, nothing special, as I remember"; and that thereafter the defendant put his arm around her and pushed her against a table which the plaintiff used in the treatment of patients. On direct examination she testified:

"Q. What then did he do, or try to do? A. *Well he tried to rape me.*

"Q. And during all of this time did you say anything to him? A. Well I kept trying to get him to quit and let me loose, and *I don't know what words I used,* but I kept trying to tell him to let me loose.

190

"Q. And would he let you loose? A. Well he finally did; I pinched him.

"Q. You did what? A. I pinched him.

"Q. And where did you pinch him, Mrs. Cullen? A. I pinched his penis.

"Q. And do you use your hands a lot while you are practicing your profession? A. Yes.

"Q. Do you have more than the ordinary or average strength of the average woman, in your hands and fingers? A. Yes.

"Q. And after you grabbed ahold of him and pinched him what then did he do, if anything? A. Well he finally got up.

"Q. And what did he do then? A. Well I tried to get something to hit him, and he ran out the door.

"Q. And did he then leave the apartment? A. Yes he left.

"Q. And go down the stairs? A. I guess so."

Three or four days after she claims she was thus attacked the plaintiff unsuccessfully solicited defendant for money "to buy or build a house" writing him the following letter:

> "Dr. Amy Lee Cullen
> Chiropractor
> Ronan, Montana.
>
> Sept. 13, '40
>
> Mr. Walter Peschel.
> City.
>
> Well what do you think of the other night's affair. Do you think you would really loan me money to buy a house or to build one?
>
> Let me know please and soon. This is important.
>
> Very truly
> Amy Lee Cullen."

A number of weeks after the above letter the plaintiff, through her attorney, wrote defendant another letter stating that "she has no desire to cause any publicity concerning the matter but insists that unless it is settled she intends to file an action * * * and to prosecute the same to the full extent of the law." Thus, for a price, would plaintiff keep quiet respecting a felony of

which she claims to have been the victim. The defendant declined to pay the price. He refused to give the plaintiff any money, and on November 23, 1940, plaintiff made good her threat by filing this suit. Immediately thereafter she departed from the state and remained away until a few days before the trial when she returned to Montana for the purpose of attempting to collect the money she had demanded.

The plaintiff's written request of September 13, 1940, seeking to obtain from the defendant a loan of money with which plaintiff could buy a house or build one, coming as it did but three or four days after the date of the alleged criminal attack upon plaintiff, is of considerable importance, for, as was said by Lord Hale: "It must be remembered that this is an accusation easily to be made and hard to be proved and harder to be defended by the party accused, though ever so innocent."

The testimony of the plaintiff in this case should be considered in the light of all the attending circumstances. It is always legitimate to consider whether the subsequent conduct of the complainant is the usual and natural conduct of an outraged woman as bearing upon the credibility of her direct testimony.

Had the plaintiff been the outraged victim of a criminal attack three or four days previous, would she likely continue to negotiate with the perpetrator of the crime for a loan of money with which to buy or build a house? Is this the usual and natural conduct of an outraged woman? Things just do not happen that way.

The charges of illicit sexual relations or of attempts to have illicit sexual relations are easily made. Often they are inspired by malice, hidden motives or revenge, and evidence to establish the same may be easily fabricated and hard to disprove. There is no class of actions attended with so much danger, or which affords so ample an opportunity for the free play of malice and private revenge. In such cases the accused is almost defenseless.

While plaintiff charged in her complaint that the defendant "did insult, disturb, disquiet and threaten her by the use of indecent language and proposals," yet there is no evidence what-

ever in the record that defendant ever threatened her or that he ever used any indecent language in her presence. The defendant denied these charges as well as the other allegations of the complaint. At the trial the plaintiff testified that at the time complained of she was "hard of hearing"; that she then had no ear trumpet although at the trial she used one and that without the aid of such trumpet she could hear very little. Plaintiff testified:

"Q. Now in this complaint you say that this man threatened you and used indecent language and proposals; can you tell us what he said? A. Well he got hold of me in his arms.

"Q. But can you tell me what he said? A. What he did?

"Q. What did he say? A. *Well I didn't hear, and I don't know what he said.*

"Q. Did you hear him say anything—did he talk? A. I don't think he talked much—he was mostly actions.

"Q. But did he talk to you at all? A. Well he was talking but I couldn't tell you what he said.

"Q. You knew he talked? A. I could see him talk and hear the sounds but *I couldn't tell the words.*

"Q. Then if he talked to you so you could hear it, other persons in the building might likewise have heard it; isn't that true, through those thin doors? A. They might what?

"Q. If he talked loud enough so you could hear it, other persons might have heard it, through those thin doors, couldn't they? A. Well yes they might."

The above testimony does not supply the evidence required to establish that plaintiff was threatened by "the use of indecent language" nor does the evidence support the plaintiff's charge that "by reason of said wrongful proposals, acts and conduct" she has been damaged in the sum of $2,500.

There is no evidence of any cash outlay by plaintiff for medicines or treatment. She consulted no physician or surgeon and she produced no medical testimony whatever to support her claims. Instead she rested her case on her own testimony and on the testimony of two of her personal friends to whom she had related some of the alleged particulars of the alleged assault and

who, without qualifications and without objection, assumed to testify regarding plaintiff's nervous system and to give their respective lay opinions as to the cause of certain discolorations which the witnesses observed on plaintiff's left arm in "the early part of September."

One of these witnesses testified she noticed a black and blue mark on plaintiff's left arm "just as though his thumb had dug into her arm and I was peeved." To this witness plaintiff did not then divulge the identity of her alleged attacker and the witness testified "I didn't know who, for many months."

The other lay witness offered by plaintiff testified she came from Missoula where she resides to Ronan to visit plaintiff and found her "under nervous shock" with marks on her left arm from which "I thought somebody had grabbed her." Without objection she testified that plaintiff was more nervous on the day of the trial "than she was *before the assault was committed on her.* * * * She couldn't wash her dishes last night. I put my hand up here and I thought her heart was going to jump out of her mouth."

When it came to fixing the day of the alleged assault the plaintiff was most indefinite. She could not say whether it was the 9th or the 10th of September or whether it was Monday or Tuesday that the defendant came to her office. Why this uncertainty as to time? Why did plaintiff not promptly report the alleged crime to the sheriff and to the county attorney? Why did she not immediately notify the witness Harold Resner who operates the hotel in which she claims she was attacked? Why did she not at once talk with the other tenants in the building so as to fix the incident in her and in their minds and ascertain what if anything they knew of the affair? These persons should have been in a position to assist plaintiff in speedily bringing the offender to the bar of justice if an offense had been committed and it would seem that the hotel proprietor and sheriff or other peace officers, at least, should have been notified.

On direct examination plaintiff testified:

"Q. And are you now sure of the date, whether it was

September ninth or September tenth? A. I can't be sure, but it was about the ninth, something near that, but I can't be sure what date.

"Q. What have you to say about it being the first of the week? A. Well the ninth was on Monday, and it was some time that week, but I can't be sure what date."

On cross-examination plaintiff testified:

"Q. Mrs. Cullen you say this happened on the ninth or tenth of September? A. About that.

"Q. Well do you know whether it was the ninth or the tenth? A. I am not sure.

"Q. Are you sure that it was September at all? A. Yes."

Surely the date of an offense as grave as plaintiff here charges should be indelibly stamped upon the mind and memory of the victim. Uncertainty as to such important matters casts doubt and uncertainty upon the remainder of plaintiff's testimony.

Plaintiff's office in the hotel fronts on the main street in Ronan. The hour was early in the evening. The doors of the office were plain wood panels. They opened into a hall. The hall is used by other occupants of the hotel, including transients. The partitions between the rooms are plain 2x4 studding covered with lath and plaster. They are not sound proof and no sound-proofing material was used in their construction.

Here the elderly plaintiff, too deaf to distinguish what was said to her, swears that a young business man from whom she admits she had long been and still is endeavoring to obtain money, made amorous advances to her and attempted to rape her.

However plaintiff's own testimony shows that when she resisted the defendant promptly desisted; that as soon as she grabbed hold of and pinched him that both amour and defendant disappeared with no attempt to overpower or to overcome plaintiff's resistance or to even argue with her. The conduct of the completely routed, scared and fleeing cattle buyer, which plaintiff pictures in her testimony, falls far short of establishing an attempt to take further liberties with plaintiff or to overcome her resistance by force or violence or by threats of immediate and

great bodily harm, accompanied by the apparent power of execution. (Sec. 11000, Rev. Codes 1935; *State* v. *Hennessy,* 73 Mont. 20, 234 Pac. 1094.)

Plaintiff produced no witnesses from the hotel wherein was located her office. No one testified to hearing any outcry or scuffle emanating therefrom. She told no one at the hotel of the affair. Although only 14 miles from the county seat, she failed to visit either the sheriff or county attorney or to cause defendant's arrest or criminal prosecution. She told no one in the town where she resided that her fellow townsman had attacked her. It was not until long after her various attempts to get money out of defendant had failed that plaintiff disclosed to her friend Mrs. Kinney the identity of her alleged assailant.

''While the jurors are the sole judges of the facts, the question as to whether or not there is substantial evidence in support of the plaintiff's case is always a question of law for the court (*Grant* v. *Chicago, etc., Ry. Co.,* 78 Mont. 97, 252 Pac. 382), and, in determining this question, 'the credulity of courts is not to be deemed commensurate with the facility or vehemence with which a witness swears. ''It is a wild conceit that any court of justice is bound by mere swearing. It is swearing creditably that is to conclude its judgment.'' ' (*Casey* v. *Northern Pac. Ry. Co.,* 60 Mont. 56, 198 Pac. 141, 145; *Whitney* v. *Bertoglio Mercantile Co.,* 65 Mont. 358, 211 Pac. 323; *Vukmanovich* v. *State Assur. Co.,* 82 Mont. 52, 264 Pac. 933.)

''A variation to the rule above that we must view the evidence in the light most favorable to the plaintiff [where motions for nonsuit and directed verdict were denied] is that, 'if a person testify in his own behalf, and there are material conflicts and contradictions in his testimony, he is not entitled to recover if he be the plaintiff, unless that portion of his testimony which is least favorable to his contention is of such a character as to authorize a recovery in his behalf.' (*Putnam* v. *Putnam,* 86 Mont. 135, 282 Pac. 855, 859; *Lasby* v. *Burgess,* 88 Mont. 49, 289 Pac. 1028; *Merritt* v. *Tague,* 94 Mont. 595, 23 Pac. (2d) 340.) While plaintiff's testimony contains statements which may be

said to render his version of the accident more credible than certain of those quoted above, under the last-quoted rule, those statements are to be disregarded. 'It cannot be unfair to this plaintiff to deal with his case from the standpoint of his own statements.' (*Putnam* v. *Putnam,* supra)." (*Morton* v. *Mooney,* 97 Mont. 1, 12, 33 Pac. (2d) 262, 266.)

"The rule has been stated repeatedly. in this jurisdiction that a court may reject the most positive testimony, though the witness be not discredited by direct evidence impeaching him or contradicting his statements. The inherent improbability of his story may deny it all claims to respect." (*Casey* v. *Northern Pac. R. Co.,* supra.)

The plaintiff's conduct in writing the defendant three or four days after the alleged assault inquiring if defendant would really loan her the money to buy a house or to build one; her failure to mention the alleged affair to the proprietor of the hotel or to any of the guests or tenants in the hotel; her failure to promptly report the matter to the sheriff; her failure to promptly cause criminal proceedings to be brought against defendant; her neglect and failure to be examined or treated for her alleged injuries; her failure to produce any medical testimony whatever to support her claims; her persistent endeavors, both before and after the alleged assault to obtain money from the defendant three or four days after the alleged offense; the great difference in the ages of the parties; the fact that she produced no witness who heard any disturbance or outcry; and the fact that the incident is alleged to have occurred in a more or less public place with unlocked doors, centrally located on the main street of Ronan at an early hour in the evening when and where a disturbance or outcry would in all probability be heard by many but which was not heard by any, all tend to weaken plaintiff's story and to make for the inherent improbability of it. If, as plaintiff testified, the defendant really attempted a criminal assault upon her the criminal courts of the state were open to her. She owed it to herself, to society and to the state to promptly lay the facts before the proper authorities, including the

county attorney, to the end that criminal prosecution result and the alleged offender, if guilty, be punished. But here the plaintiff, in a civil action, complains that a felony has been committed against her which she will forgive and forget, for a money settlement from the alleged perpetrator, against whom she has not seen fit to cause criminal proceedings to be instituted by the state.

In our opinion the evidence fails to support the verdict and judgment. The judgment is therefore reversed and the cause remanded to the district court with directions to dismiss the action.

ASSOCIATE JUSTICES ANDERSON and MORRIS concur.

MR. JUSTICE ERICKSON:

I dissent. In my opinion the majority has substituted its judgment for that of the jury as to the credibility of the witness. The majority opinion leaves out much of the testimony which supports the plaintiff's version of what transpired. But even the testimony quoted shows that this is only the usual case where there is a conflict in the testimony of the various witnesses. The jurors were all from Lake county, chosen in the constitutional way. They saw the witnesses and heard their testimony. The learned trial judge, after hearing the testimony and seeing the witnesses, did not find the conflict in the plaintiff's own testimony nor the inherent improbability which the majority in this court sees and that fact is entitled to great weight here. This court has repeated over and over again that credibility of the witnesses is for the jury to determine. The exception is found in *Casey* v. *Northern Pac. R. Co.*, 60 Mont. 56, 198 Pac. 141. The facts in this case do not measure up in any degree to those in the *Casey case*, and even there the court experienced some difficulty in reaching the conclusion it did, and this court has followed that decision only in the most extreme cases. In my mind the evidence is ample to sustain the verdict of the jury.

MR. CHIEF JUSTICE JOHNSON:

I agree with the majority in their opinion of the preponderance

of the evidence; but since this court has not been given the authority to overrule the jury in that respect, I am compelled to concur with the above dissenting opinion of MR. JUSTICE ERICKSON.

Rehearing denied November 19, 1943.