A. T. KLEMENS & SON, a Corporation, Plaintiff and Respondent, v. REBER PLUMBING AND HEATING COMPANY, a Corporation, Defendant and Appellant.

No. 10128.

Submitted January 11, 1961. Decided March 15, 1961.

Rehearing denied April 25, 1961.

360 P.2d 1005.

116

Ralph J. Anderson, Helena, argued orally for appellant.

Joel G. Roth, Great Falls, for respondent.

Howard C. Burton, Great Falls, argued orally for respondent.

MR. JUSTICE CASTLES delivered the Opinion of the Court.

This is an appeal from a judgment entered in favor of the plaintiff in the district court of the eighth judicial district. The action was for damages for breach of contract tried before the district court sitting with a jury. Judgment was entered for the plaintiff in the amount of $5,097.35 which included the jury's verdict of $5,079 plus costs of $18.35. The defendant has appealed from this judgment.

The plaintiff, A. T. Klemens & Son, and the defendant, Reber Plumbing and Heating Co., are both Montana corpora-

tions. J. R. Klemens, the president of the plaintiff corporation and J. B. Reber, the president of the defendant corporation, participated in the negotiations between the two corporations. Hereinafter A. T. Klemens & Son and J. R. Klemens will both be referred to as the plaintiff, and Reber Plumbing and Heating Co. and J. B. Reber will both be referred to as the defendant.

The main points in issue in this case can be determined by a summary of the various allegations of the complaint and the answer. On October 15, 1956, the trustees of School District Number One called for bids for the construction of the new East Junior High School in Great Falls, Montana. One of the three contracts the trustees offered for bid was the mechanical contract which involved the furnishing of all labor and materials necessary for: (1) plumbing fixtures, (2) heating, ventilation, temperature control, and refrigeration systems, and (3) outside utilities.

On or about October 19, 1956, the defendant requested that the plaintiff prepare and submit to the defendant a sub-bid for the installation of the ventilation system to be incorporated in the defendant's bid for the entire mechanical contract. The plaintiff alleges that it submitted the sub-bid on the agreed condition that if it were the low sub-bid on such work received by the defendant, and the defendant was awarded the entire mechanical contract, the defendant would give the plaintiff the ventilation work. The defendant admits it solicited the plaintiff's sub-bid, but denies that it agreed to these conditions.

On December 12, 1956, the trustees rejected all bids as being too high, but on January 22, 1957, issued a new call for bids for the construction of the school.

The plaintiff alleges that once again the defendant solicited the plaintiff for a sub-bid on the ventilation system. The plaintiff further alleges that it gave the defendant a new sub-bid acting on the belief that its giving of such sub-bid was conditioned on the same premise that if it were the low sub-bid

submitted to the defendant on the ventilation work and the defendant were the low bidder on the entire mechanical contract, the defendant would give the ventilation work to the plaintiff. The defendant denies that it accepted the plaintiff's sub-bid on this condition.

On February 6, 1957, the trustees awarded the mechanical contract to the defendant. The plaintiff alleges that after such award the defendant advised the plaintiff that the defendant could purchase certain heating and ventilating units at a lower price than the plaintiff and requested that the plaintiff modify the arrangements existing between the parties by deleting from the plaintiff's sub-bid the price of these units plus the plaintiff's margin of profit and transportation costs thereon, the defendant proposing to procure and deliver these units to the plaintiff for installation. The defendant admits it advised the plaintiff of its ability to purchase these units at a lower price.

The plaintiff alleges that on March 2, 1957, the parties met in Helena, Montana, and modified their prior arrangements by deleting from the plaintiff's sub-bid the cost of the heating and ventilating units, the plaintiff's margin of profit thereon, and the estimated transportation costs of the units. The defendant admits that the parties met, but denies that they reached an accord on such arrangements. To the contrary, the defendant alleges that the parties met to discuss the possibilities of the plaintiff submitting a new proposal.

The plaintiff alleges that thereafter it reduced to a written agreement the understanding of the parties that had been reached at the meeting on March 2, 1957, and mailed the same to the defendant for its signature but that the defendant refused to sign the agreement. Instead the defendant notified the plaintiff that it (the defendant) would do the ventilation work and refused to permit the plaintiff to do such work. The plaintiff claims that it stood ready to do the work and by reason of the defendant's failures and refusals to permit it

to perform the plaintiff has been damaged by loss of profit in the amount of $7,618.50.

The defendant admits that it has declined to permit the plaintiff to do the ventilation work, but denies that the plaintiff has been damaged thereby.

The defendant's eleven specifications of error raise four main questions for our consideration on this appeal. These questions will be considered separately.

The first question is whether there was sufficient evidence before the district court and the jury of a binding agreement between the plaintiff and the defendant to sustain the jury's verdict and the district court's judgment. The defendant urges that, as a matter of law, the evidence demonstrates that there was no binding agreement between the plaintiff and the defendant.

There was never a written agreement which was signed by both of the parties, and the main question at the trial was whether a binding oral agreement was reached at the meeting between the parties on March 2, 1957.

Where parties to a contract verbally agree upon all of its terms but stipulate that it will not be binding until it is reduced to writing, it is not binding upon the parties until it is reduced to writing and signed. However, where the parties intend the contract to be binding from the time that it is orally made with an agreement that it will later be reduced to writing the failure to reduce the agreement to writing does not affect its binding force. Hunt v. S. Y. Cattle Co., 75 Mont. 594, 244 P. 480. Also see 17 C.J.S. Contracts § 49.

In his testimony the defendant at all times denied that there was ever a binding oral agreement reached between the parties at the meeting on March 2, 1957.

Upon direct examination the plaintiff asserted that there was a definite agreement, prior to the first bid letting, that if the plaintiff was the low sub-bidder on the ventilation portion of the contract with the defendant, and the defendant was the

low bidder on the entire mechanical contract the plaintiff would get the job for the ventilation portion of the contract. The reason for this type of agreement, according to the plaintiff's testimony, was because the defendant was a competitor of the plaintiff in sheet metal work and the plaintiff did not want to quote a figure to the defendant and give away the amount that the plaintiff had figured for the ventilation portion of the contract. The plaintiff testified that he thought the same terms applied to the second sub-bid as the first sub-bid and if the plaintiff were the low sub-bidder on the ventilation portion of the contract the plaintiff would get that portion of the job. The plaintiff made the only sub-bid on the ventilation portion of the mechanical contract and the defendant was the low bidder for the entire mechanical portion of the contract. After the defendant had the mechanical contract the plaintiff testified that he called the defendant and that the defendant asked if he could get a modification of the plaintiff's sub-bid since the defendant could buy some of the heating and ventilating units at a lower price than the plaintiff had figured in his sub-bid. In regard to this modification the parties met on March 2, 1957. The plaintiff testified that at this meeting he made a proposition to the defendant concerning these units and told the defendant that if the defendant wanted to furnish the units the plaintiff would allow the cost of the units plus the potential profit that had been figured thereon plus the cost of their transportation and deduct these amounts from the plaintiff's sub-bid. However, the plaintiff would still keep the original overhead margin since the plaintiff would have to install and adjust the units and look after them under a one year warranty. The plaintiff testified that this was agreeable to the defendant who said "that is fine and dandy, you have a deal."

On redirect examination the plaintiff testified that the agreement was intended to be binding on the parties at the time it was orally made on March 2, 1957.

However, upon cross-examination, the following conflicting testimony was elicited from the plaintiff:

"Q. But I say you didn't take Mr. Reber's word for it, you wanted it in writing before it became final, did you not? A. At the request of Mr. Reber that he wanted it—

"Q. Yes. Then both you and Mr. Reber contemplated that agreement was in writing before it was effective, did you not? A. We wanted a record—

"Q. That is right, and before it was effective they both had to be in writing?

"Mr. Burton: Just a moment, counsel. I wonder if you would be kind enough to let Mr. Klemens finish his answers before you commence your new question.

"Q. Did you have something you wanted to add to any part here? A. I have lost my train of thought now.

"Q. All right, let me start over part of it. Both you and Mr. Reber, acting for and on behalf of your organizations, contemplated before it was a final contract it would be in writing, is that not true? A. That is right.

"Q. And isn't that why you sent him the offer for him to accept it in writing? A. We agreed to do it.

"Q. That is right, and both of you contemplated it would be reduced to writing before it became effective? A. No question about that, certainly."

■ In determining whether there is substantial evidence to support a jury verdict the normal rule is that the evidence must be viewed in the light most favorable to the party who has prevailed in the district court. However, this court has purported to modify the rule by stating that if a party testifies in his own behalf and there are material conflicts and contradictions in his testimony, he is not entitled to a verdict in his favor unless that portion which is least favorable to his contention is of such a character as to authorize the verdict. Casey v. Northern Pacific Ry. Co., 60 Mont. 56, 198 P. 141; Wilson v. Blair, 65 Mont. 155, 211 P. 289, 27 A.L.R. 1235;

Putnam v. Putnam, 86 Mont. 135, 282 P. 855; Morton v. Mooney, 97 Mont. 1, 33 P.2d 262; Cullen v. Peschel, 115 Mont. 187, 142 P.2d 559; Hanson v. Lancaster, 124 Mont. 441, 226 P.2d 105.

If the above rule were followed in the instant case the plaintiff's weakest testimony, which is the quoted excerpt of his answers to questions on cross-examination, would not authorize a recovery on his behalf since it tended to show that the contract was not intended to be binding until it was reduced to writing.

Although the excerpt of testimony appears to be contrary to the basic premise of the plaintiff's position, it is obvious that the plaintiff was confused. Cross-examining counsel was neatly leading the plaintiff into continuing confusion by not allowing him to answer the questions fully until the desired answers had been obtained. Whether or not this testimony is as flatly contradictory as it appears is questionable.

The quoted excerpt, when considered with other testimony and the manner in which it was elicited, appears to have been a slip of the tongue. However, looking at the problem as if the plaintiff's testimony were contradictory we shall further examine the Montana rule.

In stating the rule concerning a party's own uncorroborated, conflicting testimony, this court has purported to follow the minority view as promulgated by the Georgia Supreme Court and in so doing has cited several of the early Georgia decisions. However, the actual holdings of some of the Montana decisions that cite the rule are not dependent upon it, as will be shown hereafter.

In opposition to the minority view, the majority rule is that contradictory statements which are made by a party are to be treated like those of any other witness, and in considering whether the contradictory testimony of a party, standing alone, will support a verdict in his favor, the view of it most favorable to him must be accepted by an appellate court.

The trier of fact is entitled to determine its weight. Several of the many cases following this rule are: Cameron v. New England Tel. & Tel. Co., 182 Mass. 310, 65 N.E. 385; Clark v. Borough of Torrington, 79 Conn. 42, 63 A. 657; Wiley v. Rutland R. Co., 86 Vt. 504, 86 A. 808; Fernald v. Kaiser & Co., Sup., 186 N.Y.S. 645; Michigan Fire & Marine Ins. Co. v. Pretty Lake Vacation Camp, Inc., 316 Mich. 197, 25 N.W.2d 166; Angelina Casualty Co. v. Bluitt, 5 Cir., 1956, 235 F.2d 764; Swanson v. Minneapolis Street Ry. Co., 252 Minn. 484, 90 N.W.2d 514; National Equipment Rental, Ltd. v. Stanley, D.C., 177 F.Supp. 583: Also see the annotation in 169 A.L.R. 798.

We believe the majority rule to be preferable both from a legal and a common-sense standpoint. We can visualize many situations where a party may be the only witness who can testify as to certain facts supporting his claim or defense. Many times counsel, in aggressive cross-examination, can elicit answers from parties which are inconsistent with their claim or defense. This is especially true where a party is a layman and not familiar with the niceties of legal terminology. It would seem grossly unjust if one or two answers on cross-examination, given because of mistake or confusion, could defeat a party's claim or defense where the party testified otherwise on both direct and redirect examination. The trier of fact should be entitled to decide which portions of the testimony should be given weight and which should be disregarded since it is in a much better position than this court to decide these questions. As Dean Wigmore has stated in discussing the propriety of giving the testimony of a party the binding effect of a judicial admission:

"* * * Testimony in court is an elusive matter of mental operations. It is the culmination of much talk and reflection and memory-stirring between all concerned. It is full of surprises at the trial. The truth of the case depends on a comparison of what all the witnesses say and all the cir-

cumstances indicate. A rule which binds a party to a particular statement uttered on the stand becomes an artificial rule. It is out of place in dealing with testimony.'' 9 Wigmore, Evidence, § 2594a, p. 601 (3d Ed. 1940).

In the instant case the plaintiff testified on both direct and redirect examination that the agreement reached between the parties was intended to be binding from the time that it was orally made on March 2, 1957, although his testimony on this point was apparently conflicting on cross-examination. This is substantial evidence to support the position of the plaintiff and the jury was entitled to return a verdict in his favor. Under these circumstances this court will not reverse the verdict of the jury and the judgment of the district court.

Several of the Montana decisions which give lip service to the minority rule are still preserved since the rule is not a part of their actual holdings. In Casey v. Northern Pacific Ry. Co., 60 Mont. 56, 198 P. 141, and Morton v. Mooney, 97 Mont. 1, 33 P.2d 262, the holdings were that this court could reverse a district court on a question of fact where the evidence supporting the finding of the district court is highly improbable, incredible or inherently impossible in view of the physical facts. In Putnam v. Putnam, 86 Mont. 135, 282 P. 855, the minority rule was cited although it was not necessary to the decision since all of the testimony concerning the specific point involved denied the right of the plaintiff to recover and there was no need to take his testimony at its weakest. In Cullen v. Peschel, 115 Mont. 187, 142 P.2d 559, the actual holding was that the plaintiff's theory was inherently improbable in light of all of the facts present in the case. To the extent that they are contrary to the holding herein the decisions of Wilson v. Blair, 65 Mont. 155, 211 P. 289, 27 A.L.R. 1235, and Hanson v. Lancaster, 124 Mont. 441, 226 P.2d 105, are overruled.

The second question concerns the amount of damages that was awarded in the instant case. There are several problems which have been raised in this respect.

First, the defendant claims that there was insufficient evidence before the district court and the jury to determine the amount of damages. The plaintiff testified as to the cost of each element of labor and materials which would go into his cost of performance and submitted exhibits demonstrating these costs and his final bids. His testimony and these exhibits make clear his method of adding an overhead factor to the total cost of labor and materials and taking 10 percent of the figure so reached as a margin of profit. His testimony and the exhibits also demonstrate the exact method used to modify the original bid at the meeting on March 2, 1957. The plaintiff was experienced in the field, and the jury was entitled to determine the amount of damages from this evidence. It was not so speculative and uncertain as to preclude recovery.

The defendant then urges that this case should be reversed since the plaintiff offered no evidence concerning a deduction which should be made from damages because of the saving of time and the release from care, trouble, risk and responsibility which was given the plaintiff because of his relief from performing the contract. This argument is erroneous. This is matter in mitigation of damages which is properly considered a defense. The burden of pleading and proving matter in mitigation of damages falls upon the defendant and the defendant has not carried the burden in the instant case since he introduced no evidence on the subject. See Miller v. Yellowstone Irr. Dist., 91 Mont. 538, 9 P.2d 795; Garden City Floral Co., Inc. v. Hunt, 126 Mont. 537, 255 P.2d 252. For an annotation supporting this view and specific cases concerning the exact problem in the instant case, see 17 A.L.R.2d 963, 990.

From the amount of damages of $5,079 which the jury awarded, it is clear that it was determined by taking 10 percent of the plaintiff's modified bid of $50,790. This shows that the jury agreed with the plaintiff's theory that 10 percent of the cost of performing the contract was an adequate

profit for the job. However, upon appeal the plaintiff has conceded that the jury award of $5,079 was excessive and has offered to settle at a lower figure. This is because the jury allowed a profit on a profit in awarding 10 percent of the final bid since an element of profit was already included in the bid. In addition to this error, we have discovered arithmetical errors in the exhibits which have been entered into evidence concerning the amount of damages.

Where the excessiveness of a verdict does not appear to have resulted from passion and prejudice and the excess can be readily determined by mathematical calculation this court may properly modify the judgment without reversing it. Nesbitt v. City of Butte, 118 Mont. 84, 163 P.2d 251; Miller v. Emerson, 120 Mont. 380, 186 P.2d 220.

Therefore, our next inquiry is whether the correct damages can be readily determined by mathematical calculation.

Where the breach of contract consists of prevention of performance, profits as an element of damages are measured by the difference between the contract price and the cost of performance after deducting the benefit that has accrued to the plaintiff for being relieved from performing the contract. 25 C.J.S. Damages § 90, p. 633. As we have already noted, the burden is on the defendant to prove the value received by the plaintiff for any benefit accruing because of relief from performance.

From the testimony of the plaintiff and the exhibits which were admitted into evidence the damages can be correctly computed.

There were two bids which were submitted by the plaintiff to the defendant after the second bid letting. The first bid was modified at the meeting on March 2, 1957, and the modified bid was the contract price that was reached for the job. This modified bid was $50,790.

The cost of performance of the contract consisted of the cost of labor and materials plus an overhead factor. The

overhead factor was computed by taking 15 percent of the cost of labor and materials. When the contract was modified there was evidence that it was agreed that the plaintiff would use the same figure for the overhead factor that was used in the first contract even though the cost of labor and materials was changed. This was because the plaintiff would still have to install, adjust and warrant the units which the defendant agreed to buy.

In adding the amounts of the items making up the plaintiff's cost of labor and materials which were submitted in its first bid, we have determined that there was a $15 error and the total should have been $50,335 rather than $50,320. Therefore, the overhead factor should have been 15 percent of $50,335 or $7,550.25.

In the modification of the original contract, the plaintiff agreed to deduct from the original cost of labor and materials the cost and transportation charges on certain heating and ventilating units if the defendant would furnish them himself. The cost of these units was $11,420 and their transportation charges were $300 giving a total deduction of $11,720. Deducting that amount from the original cost of labor and materials of $50,335 we reach a figure of $38,615 as the modified cost of labor and materials.

From this data we can compute the profit and correct damages in the following manner by deducting the cost of performance from the modified contract price:

Contract price (As modified at
the meeting on March 2, 1957) ........................................$50,790.00
Deduct cost of performance which includes: Cost
   of labor and materials (As modified at meeting
   on March 2, 1957) ................................$38,615.00
   Overhead (Not modified) ................. 7,550.25
     Modified cost of performance ......$46,165.25    46,165.25

Profit and correct damages ................................................$ 4,624.75

The jury should have awarded damages in the amount of $4,624.75 rather than the amount of $5,079. Since the excessive damages do not appear to have been awarded as a result of passion and prejudice and the correct amount can be readily determined by mathematical calculation we do not deem it necessary to reverse this decision but only necessary to modify the judgment by deducting the difference between the damages which should have been awarded and the amount actually awarded. This deduction is $454.25 leaving a balance of $4,624.75 as the correct amount of damages.

The third question is whether the plaintiff's complaint is sufficient to state a cause of action. We have thoroughly examined the complaint and find that it does state a cause of action. The defendant's contentions in this respect are without merit.

The fourth question is whether the district court committed prejudicial error in admitting into evidence claimed hearsay testimony of one of the officers of the plaintiff corporation.

In direct examination Mr. Anderson, who was the secretary and treasurer of the plaintiff corporation, testified that plaintiff Klemens called him from Las Vegas, Nevada, after the meeting with the defendant on March 2, 1957. Mr. Anderson testified that the plaintiff told him that he and the defendant had reached an agreement and that he would take care of the arrangements when he returned from his vacation.

Although this testimony may be technical hearsay we do not deem it prejudicial since similar testimony had already been admitted into evidence without objection. For this reason the defendant's objection is without merit.

The cause is remanded with directions to modify the judgment by deducting $454.25 from the final judgment of $5,097.35 giving a modified judgment of $4,643.10 and costs. As thus modified the judgment is affirmed.

. MR. CHIEF JUSTICE HARRISON and MR. JUSTICE JOHN C. HARRISON concur.

MR. JUSTICES ANGSTMAN and ADAIR specially concuring in result only.

We concur in the result reached in the foregoing opinion but we deem it wholly unnecessary to overrule either the case of Hanson v. Lancaster, 124 Mont. 441, 226 P.2d 105, or the case of Wilson v. Blair, 65 Mont. 155, 211 P. 289, 27 A.L.R. 1235, both of which are clearly distinguishable from the instant case.