CHRISTIANSON ET AL., APPELLANTS, *v.* MINCOFF ET AL.,
RESPONDENTS.

No. 8573

Submitted September 10, 1945. Decided December 1, 1945.

164 Pac. (2d) 344

Mr. P. F. Leonard, of Miles City, and Mr. Frank M. Catlin, of Wolf Point, for appellants.

140

Mr. W. B. Leavitt and Mr. D. L. O'Hern, both of Miles City, for respondents.

MR. JUSTICE CHEADLE delivered the opinion of the court.

Appeal by plaintiffs from an adverse judgment in an action for money had and received, tried by the judge of the district court sitting without a jury. The record does not disclose whether the services of a jury were dispensed with by the parties by stipulation, nor that request for a jury trial was made by either party. The transcript recites "That * * * the said cause came on regularly for hearing before the court sitting without a jury, * * *," and that both parties appeared in person and by counsel.

The pleadings are simple. The complaint alleges that on or about September 10, 1943, the defendants became and now are indebted to plaintiffs for money belonging to plaintiffs, and which was received by defendants for the use and benefit of plaintiffs in the sum of $600, which defendants hold and retain without right and without consideration. It further alleges demand upon defendants for payment, and their refusal; that defendants have wrongfully converted such money to their own use, and wrongfully withhold same from plaintiffs.

The defendants' answer consists of a general denial.

The controversy arose over negotiations for the leasing of the building known as the "Turf Bar", on Main Street in Miles City, owned by defendants. This building has been operated as a saloon, and on September 10, 1943, was under written lease to Leon Bros. the then unexpired term of which was approximately two and one-half years. On that date the building was vacant and was not being used by the lessee, for reasons here immaterial. On September 9 and 10, 1943, negotiations and discussion took place between plaintiffs and D. P. Leon, one of the lessees, relative to the transfer of the lease to plaintiffs, the former agreeing to make such transfer with an increase in the monthly rental from $75 to $100. During the negotiations it developed that plaintiffs desired the lease agreement to con-

tain an option to purchase the building, a provision not embodied in the Leon lease. At Leon's request the defendant Pete Mincoff went to Miles City and on September 10th negotiations were continued between him, Leon, and the plaintiffs. Apparently an agreement was reached between Mincoff and plaintiffs, with Leon's consent, for a lease on the property for a term to expire on December 31, 1945, with right of renewal and an option in plaintiffs to purchase at any time prior to expiration of the primary term. Monthly rental of $100 was agreed upon. On the evening of that day all the persons mentioned went to the office of H. E. Herrick, Esq., an attorney, for the purpose of having a written lease prepared in accordance with their verbal understanding. The terms of the agreement were explained to Mr. Herrick, who undertook to reduce them to writing within a day or two following. Before leaving the office, Mr. Christianson, one of the plaintiffs, delivered to Mr. Herrick $600 in cash, which was to be paid by him to Mincoff in accordance with the agreement. The application of this money is in dispute, plaintiffs insisting that, if payable under the agreement, it was to be applied to rental for the first six months, while defendants' version is that it was to be applied to rental for the last six months. Both parties agree that it was to be applied on the purchase price in the event of the exercise of the option by plaintiffs.

A written lease agreement was prepared by Mr. Herrick and signed by the defendants the following week. The plaintiffs never signed the agreement or occupied the premises. The $600 held by Mr. Herrick was delivered to Pete Mincoff on October 14, 1943, after demand made upon him for its return to plaintiffs. Plaintiffs sued to recover same from defendants.

After submission of the case the trial court made findings of fact and conclusions of law, pursuant to which judgment was entered in favor of defendants and against plaintiffs. This appeal is from such judgment.

Appellants' first twelve specifications of error are based upon the insufficiency of the evidence to support the findings and

judgment. The remaining specification is that the conclusions of law and the judgment are in conflict with the law.

It is our view that the sole question for determination is that of the sufficiency of the evidence to support the findings and judgment of the trial court. The determinative question, of course, concerns the agreement of the parties as to the delivery of the $600 by Mr. Herrick to the defendants.

Plaintiffs' contention is that the money was to be returned to them in the events, either that they were unable to procure a license from the State Liquor Control Board to operate the premises as a retail liquor store, or the written lease agreement was not executed by both of the parties thereto. Both plaintiffs testified that the money was to be delivered to Mincoff only if and when the written lease was signed by both parties. They also testified that it was agreed that the deal was not to take effect unless they were able to procure a license to operate the premises as a saloon, with a liquor quota sufficient for that purpose, in which event the money was to be returned to them. This testimony was flatly contradicted. The defendant Pete Mincoff testified as follows:

"Q. Now was there to be any payment down? A. The payment would be six hundred dollars down, and this six hundred dollars to be applied on the last six months of the rent. They gave me six hundred dollars—they gave this money to Mr. Herrick, and I told them that if this lease wasn't signed within a certain time—whenever I and my wife was to sign the lease, I come in and she signed too,—I signed it before my wife did— and when I come back I got the six hundred dollars, and I told Mr. Christianson and Mr. Volney that if they didn't sign the lease within a certain time or date that I was to get this money and they was to get no money back but it was to go on the deal.

"Q. Was that all stated in Mr. Herrick's office? A. Yes sir, it was. * * *

"Q. Now was there anything said or any conversation had, either at Mr. Herrick's office or before you went to Mr. Herrick's office, about any liquor license or quota for liquor?

A. There was never anything mentioned. * * *

"Q. And now under this agreement that you had in regard to the lease, when was the six hundred dollars to be paid to you or turned over to you by Mr. Herrick? A. As soon as we signed the contract that Mr. Herrick drawed up I was supposed to get the six hundred dollars.

"Q. By 'we' who do you mean? A. My wife and myself.

"Q. Were you to get it before it was signed by Mr. Christianson and Mr. Volney? A. That is right.

"Q. Was there any conversation had, either in Mr. Herrick's office or before that time, that the lease on this place would depend on whether they could get a quota or not? A. No sir, it was never mentioned. * * *

"Q. In the meeting in Mr. Herrick's office, or at any time before that, did you have a conversation with Mr. Christianson or Mr. Volney in which you told them that if they were unable to get a liquor license or quota that you would refund the six hundred dollars? A. No sir, I never did.

"Q. Did this lease depend upon the getting of a liquor license for the place? A. It what?

"Q. Did the lease depend upon a liquor license? A. No."

Mincoff's testimony is to a certain extent strengthened by the testimony of Mr. Herrick that the former refused to have the six hundred dollars left in the form of a check, but demanded cash. The latter testified:

"I advised that Mrs. Mincoff also should sign the lease, and it was agreed as to the terms of the lease and then the terms of the payment and the matter of the payment of the six hundred dollars came up, and this gentleman here, I think it is Mr. Chrisitanson, started to write out a check for the money and Mr. Mincoff spoke up and he said, 'Oh no,—I don't know that that is the words he said, but immediately after the motion of starting to write a check he advised Mr. Christianson that he wouldn't accept any check from him and something was said. 'Well,' Mr. Christianson said—I believe he was the one writing out the check—he said, 'I usually give a check on any deal I

am in,' and Mr. Mincoff said, 'Nothing doing, I have been hooked too often and you will have to give me the cash.' "

Mincoff's version is further borne out by his testimony and that of the witness D. P. Leon, wholly uncontradicted, that the six hundred dollars was agreed to be, and actually was, paid by Mincoff to Leon as consideration for the relinquishment by the latter of the existing lease on the building in question.

Concerning the agreement made in Herrick's office the witness D. P. Leon testified:

"Q. What was said in relation to the payment of the six hundred dollars,—What did he say? A. He (referring to plaintiff Christianson) said it was O. K.

"Q. He was to pay six hundred dollars? A. He said it was O. K.

"Q. How was that six hundred dollars to be applied? A. On the last payment.

"Q. On the last six months of the lease? A. Yes, that is right.

"Q. Now, Mr. Leon, at this conversation in Mr. Herrick's office, or at any other conversation before then, was there anything said about getting a liquor license or quota? A. At that particular time, what was discussed most was the building.

"Q. Was there anything said at that time or before that about getting a liquor license or quota? A. In regard to the liquor, never. * * *

"Q. And what was said there as to when the six hundred dollars was to be paid to Mr. Mincoff? A. When Mr. Mincoff signed the contract, and his wife.

"Q. When Mr. Mincoff and his wife signed the contract? A. Yes.

"Q. Regardless of whether it was signed by the others or not? A. That's right."

Mr. Herrick to whom the money was delivered by the plaintiff Christianson, testified with reference to the agreement, especially as to the disposition of the $600:

"Q. Mr. Herrick, during this conversation in your office

that you have testified to, was there anything said by any of these parties in relation to a liquor license or a liquor quota on the building? A. No sir—that is, you mean to me or anything in connection with this agreement?

"Q. Yes, in your office. A. No sir.

"Q. To whom was the $600 paid? A. It was handed to me by—I believe it was Mr. Christianson—whoever was making the deal.

"Q. And what were you to do with it? A. Well I objected to taking it that time of night, I objected to having that much money around, and finally I had to take it, 'And now,' I said, 'I want a distinct understanding as to what is to be done with this money.'

"Q. And was that understanding had? A. Yes sir.

"Q. And what was that? A. That I was to take the money and hold it. Mr. and Mrs. Mincoff were to sign the agreement and they were to be in either Thursday or Friday—

"Q. 'They,' you mean— A. Mr. Volney and Mr. Christianson,—and they were to be here Thursday or Friday of the next week, and if they failed to be here then, or the lease was not signed by them, I was to turn the money over to Mr. Mincoff— the six hundred dollars. That was repeated three or four times by me—.

"Q. Did the turning over of the money to Mr. Mincoff depend upon the liquor license or liquor quota being available for that place? A. I knew nothing about any liquor license or any liquor quota or anything like that. The only thing I knew was the deal made in my office, and, as I said, that if this lease wasn't signed by Thursday or Friday of the next week, then I was to turn the money over to Mr. Mincoff."

There was some evidence of negotiations between plaintiffs and Pete Mincoff relative to the transfer from the latter to the former of Mincoff's liquor license at Cohagen. This, however, took place subsequent to the agreement reached in Mr. Herrick's office. Mincoff testified that he offered this license to plaintiffs for $500, but it was not transferred because his liquor quota

was not sufficient for plaintiffs' purposes, and because it was ascertained that the Liquor Control Board would not sanction such transfer.

Plaintiffs place much stress upon a letter written by D. L. O'Hern, Esq., to the Board, on behalf of Mr. Mincoff, stating that Mr. Mincoff "now has a chance to dispose of his property in Miles City and is desirous of transferring his Cohagen license to Miles City, Montana. * * * The license would be transferred from Mincoff to Mr. D. V. Volney of Bainville, Montana, who is contemplating going into business at Miles City, Montana. * * *" This letter was dated September 16, 1943, and has no bearing, so far as we can perceive, upon the agreement concluded six days earlier. And it is not inconsistent with Mincoff's testimony with reference to the proposed sale of the Cohagen license to plaintiffs.

That portion of finding No. 2, objected to, is as follows: "—That the said sum of $600.00 in cash was paid by plaintiffs to H. E. Herrick; and it was specifically agreed that the said sum should be, by the said H. E. Herrick, paid to the defendant, Pete Mincoff, when the plaintiffs executed the lease and if they executed the same not later than Thursday of the following week, and regardless of whether plaintiffs executed said lease by the following Thursday or not, the said $600.00 was, at all events, to be paid to the defendant, Pete Mincoff, by the said H. E. Herrick." While this finding might have been made more clear, we feel that it is amply supported by the evidence, especially the testimony of Mr. Herrick. This was not so inherently improbable as to require disbelief by this or the trial court.

Likewise the other findings complained of are warranted by the evidence, including Number 4, to the effect that the agreement or the execution of the lease by plaintiffs was not in any manner conditioned upon plaintiffs being able to acquire a liquor license or liquor quota for the leased premises. Although the testimony is conflicting there is substantial evidence to support the findings, and under such circumstances they will

not be disturbed by this court. Sanders v. Lucas, 111 Mont. 599, 111 Pac. (2d) 1041; Lewis v. Bowman, 113 Mont. 68, 121 Pac. (2d) 162.

Appellants urge, by specification 13, that the conclusions of law and the judgment are contrary to law, in the following particulars:

First: That the contract was impossible of performance because of the scarcity of liquor, due to the war, and therefore void under the provisions of section 7501, Revised Codes of 1935. This argument is without merit, and is entirely unsupported by either the law or the facts.

Second: That the agreement was never completed and never became binding. This refers to the written lease agreement. The answer is the court's finding, supported by the evidence, that the $600 was to be delivered to and become the property of Mincoff regardless of whether or not the lease was completed by the signatures of the plaintiffs.

Third: That the agreement was void under the statute of frauds because not in writing. We hold that the statute of frauds is not applicable. The question here involved is not as to the validity of the leasing agreement, but as to the terms of the agreement relating to the delivery of the $600 and its subsequent ownership.

Fourth: Mutual mistake, in that both parties believed that the premises in question had a liquor quota which could be established, and that the Cohagen license and quota could be transferred to the plaintiffs. Mutual mistake is neither pleaded nor proved.

There is nothing unusual about the agreement involved as contended for by defendants and supported by the evidence. The making of a down payment or the delivery of earnest money in a transaction of this kind is common practice. Had plaintiffs attempted recovery on the ground of misrepresentation it is possible the outcome would have been different. But they chose to base their right on contract, and the trial court found against them on that theory. The agreement which that

court found was entered into may have been improvident and unwise, with most unfortunate results to plaintiffs in view of subsequent events. But it cannot be said that plaintiffs received no consideration for the $600; they were at liberty to accept the lease and to occupy the premises during the term thereof, and to purchase the building had they so desired, in either of which events they would have received full credit for the payment. The function of courts is not to make contracts, but to interpret and construe them.

As heretofore noted, we think the determinative question is whether the record contains substantial evidence sufficient to support the findings and judgment. We hold that it does, and, therefore, that the findings and judgment must be permitted to stand.

The judgment is affirmed.

Mr. Chief Justice Johnson and Associate Justice Morris concur.

Mr. Justice Adair (dissenting).

I dissent. In my opinion the evidence fails to sustain the trial court's findings of fact, conclusions of law, and judgment. The proposed lease agreement, being for a term of more than two years, was invalid and void under section 7519, Revised Codes of Montana, 1935, unless in writing. The proposed agreement was never executed. Plaintiffs having failed and refused to sign the writing, there was no meeting of the minds and no reciprocal assent thereto can be implied.

The plaintiffs, Emil Christianson and V. D. Volney, and the defendant, Pete Mincoff, were retail liquor dealers owning and operating licensed saloons in Montana. Plaintiffs' place of business was at Bainville in Roosevelt county, while the defendant Pete Mincoff owned and operated a saloon at Cohagen in Garfield county. Mincoff also owned the Turf Bar, including the real estate, building, furniture, furnishings, and equipment, located at No. 611 Main Street in Miles City, Mont., such building being fully equipped with front and back bars and with the furniture, furnishings and equipment required for dispensing liquor and operating a saloon.

At the time involved there was in force a rule or regulation promulgated by the Montana State Liquor Control Board whereby liquor was rationed and whereby only 30% of each liquor shipment received by the various state liquor stores was reserved for sale to the individual purchasers comprising the general public while the remaining 70% was reserved for the various licensed saloons or private retail liquor stores in each county to be prorated among them, the quota of each saloon being dependent and based upon the amount of liquor which had been purchased for sale at the particular place of business for the calendar year 1942.

Under the above arrangement liquor is allotted on a 30-70% basis whereby only 30% of the liquor which the Montana Liquor Control Board brings into the state is available for purchase by the individual consumers at the state-owned liquor stores, while the remaining 70% of the liquor so purchased by the Board is reserved for sale to the consumer at retail prices through the various saloons, bars and cocktail lounges licensed by the state.

The state liquor license and liquor quota for the Turf Bar were assigned to one Joseph H. Caulk prior to June, 1943, and the latter assumed to transfer same to the "Olive Bar and Lounge" in Miles City. Since the law specifically provides that every license issued by the Montana Liquor Control Board "shall set forth the name of the person to whom issued, the location by street and number of the premises where the business is to be carried on under said license"; that "Such license shall be signed by the licensee"; that it "shall be non-transferable except and only with the consent of the board"; that every license so issued "is separate and distinct, and no person, except the licensee therein named, shall exercise any of the privileges granted thereunder, and all licenses are applicable only to the premises in respect to which they are issued", Laws of 1937, Ch. 84, sec. 8, it is not clear how a valid assignment and transfer could be effected of the state liquor license theretofore issued to the proprietor of the Turf Bar at No. 611 Main Street in Miles City and of the liquor quota alotted to such premises, nor is it

clear how the assignee, Joseph H. Caulk, could effect a valid transfer of such license and quota to another and different retail liquor dealer conducting business at a wholly different location than that for which the license was issued and the quota allotted. Be that situation as it may, apparently the Board and all parties concerned treated the purported transfers of license and quota as valid transactions which left the Turb Bar without either liquor license or liquor quota. Subsequent to such purported assignments and transfers the defendant Pete Mincoff sought the consent of the Montana Liquor Control Board to transfer the liquor license and liquor quota for his saloon at Cohagen in Garfield county to the Turf Bar so owned by him in Custer county, but the Board declined to permit the transfer. Thereupon, in July, 1943, the defendant owner, Pete Mincoff, entered into a lease agreement with D. P. Leon and his brother whereby Mincoff leased to them the Turf Bar for a period of three years. At the time of entering into such lease the Leon brothers were operating a saloon at Leon Park near Miles City in Custer county, which they thought might be adversely affected by the nation-wide rationing of gasoline then in effect in which event they planned to transfer their liquor license and liquor quota from Leon Park to the Turf Bar in Miles City. It developed, however, that gasoline rationing did not adversely affect the business at Leon Park, hence there was no occasion for the Leon brothers to move their business to Miles City and they thereupon sought "to get out from under" their lease on the Turf Bar.

Such was the situation when, on September 9, 1943, the plaintiffs Emil Christianson and .V. D. Volney, on pleasure bent, journeyed from Bainville to Miles City to witness a ball game. Later in the day plaintiffs visited a number of drink emporiums in and around Miles City including the bar occupied by the Leon brothers where they became acquainted with D. P. Leon with whom they had a number of drinks and whom they accompanied on a tour of Miles City in the course of which Mr. Leon sought to interest plaintiffs in sub-leasing from him the then un-

occupied Turf Bar. Plaintiffs testified they informed Mr. Leon that they would be interested in the building if they could open up a retail liquor store and obtain a large enough quota of liquor to operate the place but they advised him that they would not sub-lease the premises from him but that they would negotiate with the owner of the property for a new lease with an option to purchase. D. P. Leon promptly communicated such fact to the defendant Pete Mincoff who came to Miles City and spent the afternoon and evening of September 10th discussing with plaintiffs the proposed lease and option on the Turf Bar. Plaintiffs testified that during these negotiations the defendant Pete Mincoff represented to them that the Turf Bar had been licensed and that it had a certain liquor quota. At about 10 or 11 o'clock that night the plaintiffs accompanied D. P. Leon and Pete Mincoff to the law offices of H. E. Herrick, Esq., for the purpose of having reduced to a written contract the result of their negotiations whereby the Turf Bar was to be leased to the plaintiffs for a term to commence in September, 1943, and to expire December 31, 1945, at a rental of $100 per month. The plaintiffs were to pay to the defendant owner, Pete Mincoff, at the time of the execution of the written agreement the sum of $600 in cash, which amount was to be applied as advance rental on the rental of the premises during the last six months that the premises were to be occupied by plaintiffs under the terms of the proposed lease. The proposed contract was also to contain an option to purchase with the provision that in case such option was exercised prior to December 31, 1945, then the $600 advance rent to be paid by the plaintiffs was to be credited on the purchase price of the premises.

Mr. Herrick testified that when the parties visited his office "it was quite late that evening and there was no way of preparing the lease, no stenographer or secretary" and that the parties understood that he would at a subsequent time reduce the proposed agreement to writing and that the parties were thereafter to return to his office and sign the proposed instrument by the 16th or 17th of September, 1943.

At the request of the defendant Pete Mincoff the plaintiff Christianson deposited with Mr. Herrick the $600 advance rental to be provided for in the proposed contract which was to be thereafter written. Christianson testified that at the time he deposited the $600 with Mr. Herrick: ''I said that $600 don't mean a thing. He (Mincoff) said, if you can't get the liquor quota you don't need to take the place.'' Upon the deposit with him of the $600, Mr. Herrick gave plaintiffs his receipt therefor, reading:

''No. 2067

Sept. 10- 1943

Received of Emil Christianson

and V D Volney

Six Hundred Dollars

Dep on Rent in re contract with Pete Minkoff for Lease

of Bldg 611 Main St. Miles City Montana

$600.00 H. E. Herrick.''

It is clear from the foregoing that the $600 was deposited on rent which was to accrue under the terms of the proposed written agreement for the lease of the building at 611 Main Street in Miles City, Mont., which agreement had not yet been executed nor even written.

The proposed lease being for a period of more than two years was invalid and void unless and until it was reduced to writing and executed. Section 7519, Revised Codes of Montana, 1935, provides: ''The following contracts are invalid, unless the same, or some note or memorandum thereof, be in writing and subscribed by the party to be charged, or his agent: * * *

''5. An agreement for the leasing for a longer period than one year, or for the sale of real property, or of an interest therein; * * *.''

It is apparent that the parties fully appreciated that the result of their negotiations must be reduced to writing and executed before it became a valid and binding contract and it was for the purpose of complying with the statute and reducing

their long-term lease agreement to writing that the parties sought the aid of counsel.

After depositing the $600 with Mr. Herrick plaintiffs endeavored to ascertain whether there were available a liquor license and liquor quota for the Turf Bar. Upon making inquiry of the state liquor vendor at Miles City plaintiffs were informed that formerly the Turf Bar had both liquor license and liquor quota but that same had been assigned and transferred to Mr. Caulk, leaving the premises without either liquor license or liquor quota since June, 1943. Plaintiffs testified that the defendant Pete' Mincoff had represented to them that he never purchased less than $100 worth of liquor *per week* for his bar at Cohagen, Montana, and that the liquor license and liquor quota for such bar could be transferred to the Turf Bar so owned by him at Miles City. To check such representations the plaintiffs on September 11th, being the day following the deposit of the $600 with Mr. Herrick, drove to Garfield county where, after talking with the state liquor vendor and with the state liquor inspector at Jordan, they discovered that the defendant Pete Mincoff had been purchasing for his Cohagen bar only about $100 worth of liquor *per month* instead of that amount per week, and further, that the Montana State Liquor Control Board would not permit a transfer of the Mincoff liquor quota from Garfield county to Custer county.

On making these discoveries plaintiffs promptly called Mr. Herrick by long distance telephone and directed him ''to hang onto that money,'' being the $600 which plaintiffs had deposited with him, until plaintiffs could return to Miles City, advising him that the defendant Pete Mincoff had misrepresented the facts to them; that plaintiffs would not be permitted to operate under the license and quota which Pete Mincoff had for his place at Cohagen, and that under such circumstances the Turf Bar would not be worth anything to them.

Mr. Herrick testified that he prepared the proposed lease agreement from the notes which he had made in his office on the night of September 10th and that thereafter on either the

13th or 14th of September, 1943, the defendants, Pete Mincoff and Katie Mincoff, came to his office and signed the instrument which he had prepared in the meantime.

On September 16, 1943, the plaintiffs returned to Miles City as they had agreed, at which time they accompanied the defendant Pete Mincoff to the law offices of the latter's attorney, D. L. O'Hern, Esq., for the purpose of enlisting Mr. O'Hern's services in an attempt to obtain a liquor license and quota for the Turf Bar. Mr. O'Hern placed a long distance telephone call for Mr. McDonald, the state liquor administrator, at Helena, but being unable to thus contact the administrator, Mr. O'Hern then wrote the following letter to the Montana State Liquor Board, viz:

"September 16, 1943.

"Montana Liquor Control Board,

"Helena, Montana.

"Gentlemen:

"On June 24, 1943, Mr. McDonald wrote us concerning the possible transfer of a license of Pete Mincoff at Cohagen, Montana, to a place which he owns in Miles City, Montana. Mr. McDonald among other things wrote:

" 'I can see no out for Mr. Mincoff but to buy the license that is now used in the Turf, unless he would transfer his license from Cohagen, and then he could not transfer his liquor allotment which would give him only two basic cases at the Turf, as that is the rule under the present allotment of liquor.'

"Mr. Mincoff now has a chance to dispose of his property in Miles City and is desirous of transferring his Cohagen license to Miles City, Montana. I understand from this letter that he would be permitted to do so, and I assume that the license would carry the allotment which he now gets in Garfield County with it. Am I correct in this assumption, and if so, what would be the allotment for this license after it should be transferred to Miles City, Montana? The license would be transferred from Mincoff to Mr. D. V. Volney of Bainville, Montana. Of course, we understand that Mr. Volney would have to pay an additional

$250.00 license fee if the Cohagen license is transferred from Cohagen, Montana to Miles City, Montana.

"Mr. Volney is particularly anxious to know what his allotment would be after the license would be transferred to him and used in Miles City. He is anxious to return to Bainville, Montana, so would appreciate your wiring us at our expense the first thing in the morning.

"Yours truly,

"DLO :s"

In response to the above communication the Montana State Liquor Control Board advised that the liquor allotment for the defendant Pete Mincoff's bar at Cohagen in Garfield county could not be transferred to the Turf Bar in Custer county.

For anyone to sell liquor at the Turf Bar it was first absolutely necessary to obtain both a state liquor license and a liquor quota or allotment for the place and since the defendant Pete Mincoff and plaintiffs were wholly unsuccessful in obtaining either license or quota for the place, the plaintiffs informed Mr. Herrick that they did not intend to sign the written lease agreement which he had prepared as the place had no value to them unless they could obtain liquor and the right to sell on the premises. Mr. Herrick testified that he talked with the plaintiff Christianson "and he was dissatisfied with the deal, and he said it wasn't worth anything if he could not get the liquor, and he might have asked me for the money, I don't recall." Plaintiffs testified that they made demand upon both Mr. Herrick and upon the defendant Pete Mincoff for the return of their $600 but that both Mr. Herrick and Mr. Mincoff declined to comply with such demand.

The trial court made a finding of fact to the effect that when plaintiffs deposited the $600 with the attorney it was specifically agreed that such sum should be by the attorney "paid to the defendant, Pete Mincoff, when the plaintiffs executed the lease and if they executed the same not later than Thursday of the following week (September 16, 1943), and regardless of whether plaintiffs executed said lease by the following Thursday (Sep-

156

tember 16) or not, the said $600 was, at all events, to be paid to the defendant, Pete Mincoff, by the said H. E. Herrick.'' The record clearly shows that the attorney did not comply with the terms and conditions so alleged to have been ''specifically agreed'' upon and that he did not pay the money to the defendants Mincoff at the time they affixed their signatures to the writing nor did he deliver any portion of the $600 to them until October 14, 1943, being a month later, at which time the attorney took from Mincoff a receipt reading:

"No. 2078
Oct 14 1943

Received Of H E Herrick

Six Hundred Dollars

Recd of Emil Christenson and V C Volney

For Lease of Bldg 611 Main St. when Contract to be signed by 16 or 17 of Sept by above parties.

$600.00 Pete Mincoff

It will be noted that when introduced in evidence the word ''when'' in the above receipt had been lined or crossed out. Notwithstanding, the words ''Contract to be signed by 16 or 17 of Sept by above parties'' written in the receipt disclose that the attorney and Mincoff both understood that the contract was to be signed by the plaintiffs Christianson and Volney, they being referred to in the receipt as the ''above parties,'' and of course with such expressed intent and understanding by all the parties concerned there was and is no valid contract unless and until the document is executed by all the parties including plaintiffs. As plaintiffs never executed the proposed agreement, there was and is no contract or right in defendants to retain plaintiffs' money.

On October 22, 1943, being eight days after the attorney delivered the money to Pete Mincoff, plaintiffs brought this action to recover the $600 so deposited with the attorney and by him delivered to defendants.

At the trial the plaintiffs took timely exception to the court's

findings and conclusions and on this appeal assign error in the making of same.

Finding of fact No. 1, in part, recites: "That on or about September 10th, 1943, the plaintiffs agreed to purchase and take over from Mr. Leon his said lease on the premises known as the Turf Bar on the basis of $100.00 per month, or $25.00 per month in excess of the rent he was paying."

The quoted portion of finding No. 1 is contrary to the evidence and erroneous. Plaintiffs did not on September 10, 1943, or at any other time agree "to purchase" from Mr. Leon nor did they agree to "take over from Mr. Leon" his said lease on the premises. True, Mr. Leon made an earnest endeavor to sublease the Turf Bar to plaintiffs and the matter was much discussed but plaintiffs steadfastly refused to enter into any contract with Mr. Leon.

The plaintiff Christianson testified: "I had nothing to do with the lease that Leon had whatsoever."

The plaintiff Volney testified that the proposed deal was between plaintiffs and Mincoff and that plaintiffs had made no deal regarding the building until they talked with Mr. Mincoff.

While D. P. Leon testified to the conclusion that plaintiffs agreed to lease the building, he further testified, "but there was certain conversations it seemed that went along, but they (plaintiffs) came back kind of after discussing about the lease. * * * their option that Mincoff was discussing, that I had no authority on that.

"Q. Was that agreed to? A. No, not on that, *the deal wasn't completed there so far as the options.* * * *

"Q. How long did you dicker with them for the lease? A. Dicker with who?

"Q. With Mr. Christianson. A. Just two conversations is all.

"Q. I mean, how long a lease were you to give them? A. I *would have given* them a lease for three years, *I couldn't sell anything I didn't have.*

"Q. But that deal wasn't finished? A. It was finished, because they had everything I had in my lease.

"Q. Well then, after the deal was finished with you, why was it necessary to take it up with Mr. Mincoff? A. Because they wanted to deal with Mr. Mincoff, *they didn't want to sublease with me.*"

There was no written contract between the plaintiffs and Leon; there was no note or memorandum subscribed by Leon or by plaintiffs; and there certainly could be no valid oral agreement by plaintiffs "to purchase and take over from Leon" his 3-year written lease which then had more than two and one-half years yet to run.

"A contract for the assignment of a leasehold estate is generally regarded as one for the sale of an interest in or concerning land and within the statutes relating to such contracts. * * * An oral agreement to assign a lease having more than a year to run is within the statute of frauds. * * * And since the statute against creating a parol lease applies to those which are carved out of a term as well as out of the inheritance, it cannot be said that a termor can assign his whole interest verbally when he could not underlet a part of it without writing." 49 Am. Jur. "Statute of Frauds," 520, sec. 191.

Section 6859, Revised Codes, provides: "An estate in real property, other than an estate at will for a term not exceeding one year, can be transferred only by operation of law, or *by an instrument in writing subscribed by the party disposing of the same,* or by his agent thereunto authorized by writing." (Emphasis mine.) See, also, section 7519, Revised Codes of Montana.

The trial court's finding No. 3 reads: "That in the evening of September 10th, 1943, the plaintiffs, the defendant Pete Mincoff, and the said D. P. Leon, went to the office of H. E. Herrick in Miles City, Montana, *for the purpose of having their said agreement reduced to writing,* and in the said office of the said H. E. Herrick *all of the terms and conditions to be incorporated in the lease agreement was fully understood and agreed upon* as well as the payment of the $600.00 to the said

H. E. Herrick and his payment of the same to the defendant Pete Mincoff, and *in accordance therewith the said H. E. Herrick reduced the said agreement to writing* and the same was executed by the defendants but has not been executed by the plaintiffs." (Emphasis mine.)

Mr. Herrick testified that late on the night of September 10, 1943, the parties agreed upon the terms of the lease and option; that he subsequently reduced to writing that agreement as it was related to him by the parties and that, in his opinion, the written instrument which he prepared contains "all the terms and conditions of that transaction."

The first paragraph of the writing so prepared by Mr. Herrick reads:

"This agreement made and entered into this 10th day of September, A. D., 1943, by and between Pete Mincoff and ................... Mincoff, his wife, of Cohagen, Montana, the parties of the First Part, hereinafter called the lessors, and Emile Christiansen and V. D. Volney, both of Bainville, Roosevelt County, Montana, parties of the Second Part, herein after referred to as the leasees, Witnesseth:"

The concluding paragraph of the instrument reads:

"In witness whereof, the parties have set their hands and seals this ................... day of September, A. D., 1943.

"........................................................ (Seal)
"........................................................ (Seal)
"Lessors, Parties of the First Part.
"........................................................ (Seal)
"........................................................ (Seal)
"Leasees, Parties of the Second Part."

Following the foregoing is a form of acknowledgment reading:

"State of Montana |
 }ss.
"County of Custer |

"On this ................... day of September, A. D., 1943, before me, the undersigned, a Notary Public for the State of Montana, personally appeared Pete Mincoff and ................... Mincoff, his

wife, and Emile Christiansen and V. D. Volney, known to me to be the parties whose names are subscribed hereto in the foregoing instrument, and acknowledged to me that they executed the same.

"In witness whereof, I have hereunto set my hand and affixed my Notarial Seal the day of which is above written.

"........................................................................

"Notary Public for the S t a t e of Montana.

"Residing at Miles City, Montana.

"My Commission expires April 21, 1945."

Following the acknowledgment form is a proposed agreement respecting the personal property in the building, reading:

"It is understood and agreed that the following articles of personal property are in said building and may be used by said leasees:

| | |
|---|---|
| 1 poker table | 1 cigar case |
| 3 gas stoves | 1 bar, equipped with hot and |
| 1 whiskey case | cold water |
| 1 safe | 1 ice box |
| 8 small tables | 5 cuspidors |
| 30 chairs | 1 21 table |
| 1 rocking chair | 1 air pump |
| 2 chromium chairs | 1 cooling system |
| 2 settees | |

Articles in the upstairs rooms:

| | |
|---|---|
| 3 tables | 1 refrigerator |
| 2 small round tables | 1 cook stove |
| 1 piano | 1 water heater |
| 3 stoves | 1 cupboard |
| | 1 desk |

said articles of personal property are not to be removed from said premises by lessees and to be returned to lessor at the termination of this agreement, in as good condition as when re-

ceived by leasees, reasonable wear and tear and damage by the elements excepted.

> " ------------------------------------------------------------
>
> " ------------------------------------------------------------
>
> "Lessors
>
> " ------------------------------------------------------------
>
> " ------------------------------------------------------------
>
> "Lessees."

It is quite clear from the foregoing that it was intended that the written instrument which Mr. Herrick was to prepare was to be signed and executed by the defendant Pete Mincoff and his wife, designated therein as "the parties of the First Part" and also as "Lessors", and that it was also to be signed and executed by the plaintiffs, designated therein as "parties of the Second Part" and as "Lessees."

Mr. Herrick testified: "Q. Now what was the understanding as to when the agreement was to be signed by those parties? A. I believe it was the 10th of September, that night, that the agreement was made, and Mr. and Mrs. Mincoff were to sign the same and they were to come back a following week.

"Q. Who was 'they'? A. That is Mr. Christianson and Mr. Volney,—I believe his name is,—Thursday or Friday of the next succeeding week to sign the agreement."

Mrs. Mincoff, named in the written instrument as one of the lessees and a party of the first part, was not present during the negotiations in Mr. Herrick's office or during the discussions had prior thereto and of course she knew nothing of the terms and conditions of the proposed agreement which she was expected to sign and execute until sometime after the night meeting in Mr. Herrick's office.

The plaintiff Emil Christianson testified, "We was supposed to o.k. the contract, * * *—the contract was supposed to be o.k'd,—it was supposed to be signed by all four of us, by all four of the parties."

The plaintiff V. D. Volney testified, concerning the contract, that Mr. Herrick "was supposed to make it out and we was

supposed to sign it, both parties. We were to look it over to see if it was satisfactory.''

The defendant Pete Mincoff testified concerning the understanding respecting the execution of the instrument which Mr. Herrick was to write

''Q. At any rate it was understood that you were all to be in Mr. Herrick's office to sign the lease? A. We were supposed to sign the lease first and Mr. Volney and Mr. Christianson had a few more days to sign the lease.''

Thus it was clearly the intention of *all* the parties that after Mr. Herrick had reduced to writing his understanding of the result of the negotiations theretofore had, the defendants, Pete Mincoff and his wife, and the plaintiffs Christianson and Volney were to return to Mr. Herrick's office on or before the 16th or 17th of September, 1943, and there read, sign, acknowledge and execute the instrument. Until signed and acknowledged by both plaintiffs and both defendants, the instrument was incomplete.

''When the intent is manifested that the contract is to be executed by others than those who actually signed it, it is inchoate and incomplete and does not take effect as a binding contract unless executed by all the parties.'' Bank of United States v. Chemical Bank & Trust Co., 140 Misc. 394, 246 N. Y. S. 595, 598. In Morrill v. Tehama Consol. M. & M. Co., 10 Nev. 125, it is said: ''It is true the parties verbally agreed to the terms of the contract as stated in the complaint, but it was to be reduced to writing and signed by both parties. They employed Waters to prepare the contract according to the terms thus agreed upon, which he did, and it was signed by McDonald as agent for defendant, but the plaintiff, for what reason does not appear, failed to sign it at the same time. * * * It is essential to the existence of every contract, that there should be a reciprocal assent to a definite proposition, and when the parties to a proposed contract have themselves fixed the manner in which their assent is to be manifested, an assent thereto, in any other or different mode, will not be presumed. Notwithstanding the instrument declared upon was fully executed on the part

of defendant, the contract was still incomplete, and neither party bound thereby." In Ambler v. Whipple, 87 U. S. 546, 556, 20 Wall. 546, 22 L. Ed. 403, the court said: "It is very clear that both parties intended to have a written instrument signed by each as the evidence of any contract they might make on that subject, and neither considered any contract concluded until it was fully executed. Under these circumstances Ambler had a right to decline to sign the paper, and until he signed he was not bound by it. * * * It is idle to say that because Ambler took a copy of it from Martin to examine he became a party to it, though he never signed it."

As was said by the Supreme Court of California in Spinney v. Downing et al., 108 Cal. 666, 41 Pac. 797, 798: "It is a general rule, to which this case presents no exception, that, when it is a part of the understanding between the parties, that the terms of their compact are to be reduced to writing, and signed by the parties, the assent to the terms must be evidenced in the manner agreed upon, or it does not become a binding obligation upon either."

The writing prepared by Mr. Herrick in two places calls for the signatures of plaintiffs; it also calls for plaintiffs' acknowledgement of the execution of the instrument as well as that of defendants; and the testimony of the defendant Mincoff, as well as the testimony of plaintiffs, is to the effect that it was their intention that *all* the parties, plaintiffs as well as defendants, were to sign the writing. Not having been signed by the plaintiffs or its execution acknowledged by any of the parties, the intention of the parties was not carried out, the writing was not completed and there was and is no enforceable contract. Accordingly, it was error for the trial court to find (Finding No. 2): "That on September 10th, 1943, an agreement was made and entered into between the plaintiffs and the defendant Pete Mincoff, and with the consent of Mr. Leon, whereby the said premises were to be leased to the plaintiffs for a period of three (3) years * * * with an option to purchase the said

164

premises during the term of the said lease at the stipulated and agreed price.''

For like reasons it was error for the trial court to make its Finding No. 4, reading: ''That the said lease agreement made and entered into between the plaintiffs and defendant Pete Mincoff was in all respects definite and certain and constituted a complete agreement; that said 'agreements or the execution thereof by plaintiffs was not in any manner conditioned upon plaintiffs being able to acquire a liquor license or liquor quota for the said leased premises.''

Further error resulted from the making of Finding No. 6 to the effect, ''That the plaintiffs have failed to prove by a preponderance of the evidence or otherwise the cause of action or the allegations set forth in their complaint * * *.''

Respecting the $600 which plaintiffs here seek to recover, the trial court in its Finding No. 2 recites: ''That the said sum of $600.00 in cash was paid by plaintiffs to H. E. Herrick, and it was specifically agreed that the said sum should be, by the said H. E. Herrick, paid to the defendant, Pete Mincoff, *when the plaintiffs executed the lease* and if they executed the same not later than Thursday of the following week, and regardless of whether plaintiffs executed said lease by the following Thursday or not, the said $600.00 was, at all events, to be paid to the defendant, Pete Mincoff, by the said H. E. Herrick.'' (Emphasis mine.)

The writing prepared by Mr. Herrick sets forth no such condition, provision or stipulation. On the contrary, the writing expressly states that plaintiffs are to pay the $600 *''at the time of the execution of this agreement''* which means at the time of the completion of the contract by the affixing of the signatures of all the parties thereto, including the signatures of the said ''parties of the Second Part'' as well as the signatures of ''the parties of the First Part'' and the acknowledgment of the execution of the instrument by each and all the subscribing parties. Mr. Herrick admitted on the witness stand

that the instrument was never completed which is but another way of saying that it has never been executed.

In its Finding No. 3 the trial court found that Mr. Herrick, after hearing from the parties "all of the terms and conditions to be incorporated * * * in accordance therewith * * * reduced the said agreement to writing" but the fact remains that he wholly failed to incorporate in his writing any such terms or conditions respecting the $600 as is set forth in the trial court's finding of Fact No. 2, supra, and, if the understanding was as set forth in such finding and as was related by Mr. Herrick when on the witness stand, then Mr. Herrick failed to incorporate in his draft "all the terms and conditions" agreed upon, and the trial court committed further error in finding that the writing so drafted and intended to evidence the proposed agreement does contain "all the terms and conditions to be incorporated in the lease agreement" as fully understood and agreed upon by the parties.

All that Mr. Herrick wrote concerning the $600 in the writing prepared by him was as follows: "It is further understood and agreed by and between the parties hereto that *the said parties of the Second Part, the leasees herein, are to pay at the time of the execution of this agreement the sum of Six Hundred ($600) Dollars, which said amount is to be applied on the rental of the said premises* during the last months that the said premises may be occupied by the said parties of the Second Part, it being the intention of the parties hereto that if no renewal is made of this lease by the said parties of the Second Part, as herein provided for, that the said rent will be applied upon the last six (6) months rent, prior to December 31, 1945, but that no part of the Six Hundred ($600) Dollars shall be applied upon the rent aforesaid if the option herein given to the lease of the said premises, for an additional three (3) years, after the expiration of the time aforesaid, herein provided for, is exercised; but that the said money shall be applied upon the rent during the final period of time that the said building is so leased by the said parties of the Second Part. * * *

"It is also further understood and agreed by and between the parties hereto that the said parties of the Second Part shall have the privilege at any time up to and including the 31st day of December, 1945, to purchase the said lands and premises together with the improvements thereon, for the sum of Ten Thousand ($10,000) Dollars, cash, and if the said Parties of the Second Part elect to purchase the said building at any time up to and including the 31st day of December, 1945, the said party of the First Part agrees to furnish an abstract down to date showing a clear and merchantable title to the said premises within ten (10) days after notice that the parties of the Second Part desire to purchase said property; and the parties of the Second Part shall have five (5) days within which to approve the title to said property, and upon approval thereof, the parties of the Second Part will pay to·the parties of the First Part the said sum of Ten Thousand ($10,000) Dollars, and should there be any defects in the title, the Parties of the First Part agree to take immediate steps to clear the title to said property and immediately thereafter, the said parties of the Second Part are to pay the purchase price for the said property, and if the said option be exercised prior to the 31st day of December, 1945, the Six Hundred ($600) Dollars advance rent paid by the said parties of the Second Part is to be credited on the purchase price of the said premises.

"It is also further understood and agreed that if the said parties of the Second Part become the purchasers of the said building and personal property after the 31st day of December, 1945, that they shall be entitled to an unearned portion of *the Six Hundred ($600) Dollars paid in advance for the rent of the said property* on the said purchase price." (Emphasis mine.)

The instrument so drafted fails to specify any particular day or date for the execution thereof and since no time was stipulated in the contract in which it was to be signed by the parties, the legal presumption is that the signing thereof was to be concurrent, and since the plaintiffs failed to sign the instrument, no reciprocal assent thereto can be implied. Morrill v. Tehama

Consol. M. & M. Co., supra. The language employed in the draft prepared by Mr. Herrick shows it to have been the clear intention of the parties as well as the understanding of the scrivener that the plaintiffs would pay and deliver and the defendants were to receive the $600 "at the time of the execution of this agreement." The word "execute" means: "To complete; to make; to perform; to do; to follow out." 1 Bouv-Law Dict., Rawle's Third Revision, p. 1111. "And 'executed' is (although 'executory' is not) applied to contracts in a sense relating to the completion of the written instruments in which they are embodied, and not to performance of their substance. In this sense 'to execute' means to complete the paper as an effective instrument; to sign it, and to seal and deliver it whenever these formalities are essential to its inception." Anderson's Dictionary of Law, p. 430.

The instrument prepared by Mr. Herrick was never executed; never completed; it has not been signed by plaintiffs, and no one has acknowledged its execution. The agreement being incomplete and ineffective, Mr. Herrick, at his peril, delivered the deposit to defendants and defendants received and retain such deposit without right.

It is quite evident that both the plaintiffs and defendants understood that a written contract was to be prepared and thereafter signed and acknowledged by both the defendants and the plaintiffs before the transaction would be complete. "But a contract is not made so long as, in the contemplation of both parties thereto, something remains to be done to establish contract relations." Central Bitulithic Pav. Co. v. Highland Park, 164 Mich. 223, 129 N. W. 46, 48, Ann. Cas. 1912B, 719. "The law does not make a contract when the parties intend none, nor does it regard an arrangement as completed which the parties thereto regard as incomplete * * * It is as essential to the finality and completeness of assent that all the parties intended should be bound as it is that all the terms should be definitely agreed upon." 12 Am. Jur., Contracts, 519, 520, sec. 23. "Where the parties to an agreement make signing a condition precedent

to their being bound, there is no contract until they have signed, although all the terms have been agreed upon." 12 Am. Jur., Contracts, 552, sec. 61.

It is clear that the $600 deposit made during negotiations and before the contemplated contract was written was to be paid to the defendants on the proposed written contract and as part of the consideration "at the time of the execution" thereof and not before, and that upon the execution of such written agreement and the delivery of the money to defendants the $600 was to be applied as "an advance rent of the property" to be "applied upon the last six (6) months rent prior to December 31, 1945" or, in the event the plaintiffs exercised their option to purchase, then, "any unearned portion of the $600 was to be applied on the purchase of the property."

While a considerable portion of the writing prepared to evidence the specific agreement between plaintiffs and defendants is devoted to the $600 to be paid by plaintiffs on the proposed contract, yet nothing is there written to indicate that the Mincoffs were to receive the $600 regardless of whether the plaintiffs, Christianson and Volney, being the other two parties to the proposed contract, read or agreed to or signed the instrument not then in existence but which the attorney was to thereafter draft from his notes. Defendants' testimony as to the alleged specific agreement concerning the $600 deposit does not jibe with what the attorney wrote in the proposed lease agreement to which the defendants subscribed.

It was to prevent just this situation and testimony that the statute of frauds of this state, as well as the original English statute of frauds and perjuries (29 Car. II, c. 3, sec. 4), were enacted, the object thereof being to prevent fraud and perjury in setting up verbal agreements concerning the class of contracts falling within the purview of the statute and to intercept the frequency and success of actions and defenses based on nothing more than loose verbal statements or mere innuendos. The statute of frauds is an enactment of the substantive law and a

contract within its purview is invalid, i.e., it has no existence unless a sufficient writing has been executed.

"The word 'invalid,' as employed in these statutes, means void; of no force or effect. Therefore the contract cannot be relied upon or furnish evidence for any purpose." Dreidlein v. Manger, 69 Mont. 155, 220 Pac. 1107, 1109. "While there are intimations to the contrary of the rule in a few scattered decisions, the general rule is that an oral agreement to reduce to writing a contract which is within the scope of the operation of the statute of frauds, or to sign an agreement which the statute of frauds requires to be in writing, is invalid and unenforceable. Neither promise is enforceable unless the statute is satisfied. In other words, a parol agreement invalid under the statute is not aided by a further parol agreement to reduce the principal agreement to writing. To allow the enforcement of such an agreement would be tantamount to taking the main contract out of the statute, and as has been said, it is absurd to say that an oral promise in relation to certain subject matter is invalid, but that a promise that the party will thereafter bind himself with respect to the subject matter is valid. Such a construction would be a palpable evasion of the statute, and let in all the evils against which it is directed. * * * The rule that an oral agreement to execute an agreement which is within the statute of frauds or to sign an agreement which that statute requires to be in writing is invalidated by that statute is applicable regardless of the character of the contract which is to be reduced to writing, and applies * * * to oral contracts to execute written contracts for the sale or transfer of interest in land, for the sale of goods, wares, and merchandise, * * *." 49 Am. Jur., Statute of Frauds, 368, sec. 6.

In an attempt to justify their retention of the $600 defendants contend that they are entitled to such sum under the terms of a verbal contract completed in the attorney's office on the night of September 10, 1943, forgetting that the money had been merely deposited with the attorney and that it was not to be paid to defendants until "the time of the execution of this

agreement'' and that under this understanding of the parties the contract could not have been completed without the execution of such written contract by the respective parties. Hogan v. Shields, 20 Mont. 438, 52 Pac. 55. As before stated, the burden of proof is on the party claiming that the contract was complete to establish such fact by competent evidence. The deposit was made and intended as advance rent on the proposed contract calling for a lease for more than a two-year period on real property with an option to purchase same, which contract is invalid, void and nonexistent unless in writing. Section 7519, Revised Codes, 1935. The record herein clearly shows that no such written contract was ever completed, i.e., executed, hence there was and is no contract. The purported "contract" on which defendants rely to justify their retention of the money deposited by plaintiffs being invalid under the statute of frauds, and therefore non-existent, defendants have failed to show any right to the $600 so wrongfully delivered to and received by them. The defendant Mincoff knew that plaintiffs were in the retail liquor business; that the one and only purpose for which they desired the Turf Bar was to conduct therein a licensed saloon; that there was neither liquor license nor liquor quota available for such place of business; that he, Mincoff, had made repeated unsuccessful attempts to obtain a state liquor license and liquor allotment for the business and that he had likewise failed in his attempts to transfer the liquor license and quota for his bar at Cohagen to the place in question. For the $600 which plaintiffs deposited as advance rental to become due in the future under a proposed contract which was never executed the defendants gave and the plaintiffs received nothing.

In my opinion the trial court's findings of fact, conclusions of law, and judgment should be set aside and judgment should be ordered for plaintiffs for the money thus wrongfully had and received by defendants.

Mr. Justice Angstman (dissenting).

I am not able to agree with the views of the majority. It seems clear to me, when all of the evidence is considered, that it

was the understanding of the parties that no contract of lease was to be accomplished until the written lease was drafted and signed by the plaintiffs as well as the defendant and his wife.

The written contract prepared by Mr. Herrick so indicates, and the receipt given by defendant to Mr. Herrick for the $600. so states. The evidence offered by plaintiffs was to that effect. Defendant did not deny that such was the case but said: "We were supposed to sign the lease first and Mr. Volney and Mr. Christianson had a few more days to sign the lease."

While defendant made the statement that the $600 was to be paid to him by Mr. Herrick as soon as he and his wife signed the contract, regardless of whether the plaintiffs signed it, I think this statement is so completely refuted by the writings, the conduct of the parties and the circumstances in the case as to bring the case within the rule announced in the case of Casey v. Northern Pac. R. Co., 60 Mont. 56, 198 Pac. 141, and kindred cases. In this connection it should be noted that the $600 was not in fact paid to defendant when he and his wife signed the lease but was paid about a month later and after plaintiffs had requested Mr. Herrick to hold it because of misrepresentations. It seems unbelievable that plaintiffs would bind themselves by a written contract which had not yet been drafted at the time the $600 was deposited.

Within the rule of the Casey case, I think there is lacking substantial evidence supporting the finding that the $600 was to be surrendered by Mr. Herrick to defendant regardless of whether plaintiffs executed the lease.

I think the cause should be remanded with directions to enter judgment for plaintiff.

Rehearing denied December 31, 1945.